[No. 14946.  Department Two.  January 6, 1919.]

## MARY METON, *Appellant*, v. INDUSTRIAL INSURANCE DEPARTMENT, *Respondent*.[1]

MARRIAGE (11, 14)—BY COHABITATION AND REPUTATION—PRESUMP-
TIONS—EVIDENCE.  A presumption of lawful marriage from holding
out and cohabitation cannot be indulged where the proofs show
that the parties, unable to speak or read English, relied upon appli-
cations and affidavits for a marriage license which they paid for
and supposed constituted a lawful marriage, no license ever having
been issued or ceremony performed.

MASTER AND SERVANT (121-2)—WORKMEN'S COMPENSATION ACT—
"DEPENDENTS"—"WIDOW."  One who lived with deceased as his wife,
believing herself to be lawfully married, is not a "dependent" of
the deceased, as defined by the workmen's compensation act, Rem.
Code, § 6604-3, specifying "widows" and certain relatives as within
the definition.

Appeal from a judgment of the superior court for
King county, Frater, J., entered January 16, 1918, af-
firming an order of the industrial insurance depart-
ment rejecting a claim for compensation, after a hear-
ing on the merits before the court.  Affirmed.

*George H. Rummens* and *Jay C. Allen,* for appellant.

*The Attorney General* and *D. E. Twitchell, Assistant,*
for respondent.

PARKER, J.—This is an appeal by the claimant, Mary
Meton, under § 6604-20, Rem. Code, from the decision
of the superior court for King county, affirming a de-
cision of the state industrial insurance department re-
jecting and disallowing her claim made against the
accident fund created under our workmen's compensa-
tion act.  Her claim is made as the widow of Nick
Meton, deceased, who, it is conceded, was killed while
engaged in an extra-hazardous employment under
such circumstances as to entitle his widow, if he left

[1]Reported in 177 Pac. 696.

one, to compensation from that fund. The only questions here presented are, Is appellant the widow of Nick Meton; and, if not, is she a dependent of him within the meaning of the workmen's compensation act?

There is no definition of the word "widow" to be found in the act, though there is of the word "dependent," apart from the word widow. It is therefore plain that the word widow, as used in the act, must be given its ordinary meaning, which is, "A married woman whose husband is dead." 3 Bouvier's Law Dictionary (Rawle's 3d Rev.), 3454.

It is conceded that appellant has not married since the death of Nick Meton, so our first inquiry is, Was appellant his lawful wife at the time of his death?

On September 21, 1911, appellant, then a widow, and Nick Meton went to the court house in Pacific county to get a license to be married, and, we may assume, with the intention of then and there being married. They are Polish people, and neither of them could then speak or understand the English language. There went with them to the auditor's office the eight-year old daughter of appellant, who acted as interpreter, as best she could, in the conversation there had between them and the deputy auditor. The deputy filled out the forms of affidavits required by Rem. Code, § 7164, to be made by each of the parties applying for marriage licenses, which appellant and Nick Meton then signed and swore to before the deputy, who thereupon so certified, attaching the official seal of the office to his certificate. There being no disinterested person present of sufficient age who could make the third affidavit, as required by Rem. Code, § 7164, as a prerequisite to the issuing of a marriage license, the deputy gave to them a form for such affidavit, informing them, as best he could through appellant's

daughter as interpreter, of the necessity of having such affidavit made by a third person, and instructing them to have the same made by some such person, and return the same to the auditor's office, when he would issue the marriage license. He then gave to them the papers, including the affidavits already made by them and so certified by him, expecting they would all be returned properly executed within a few days, when he would issue the license. At that time Nick Meton paid the fees for the issuing of the license. They then left the auditor's office, and subsequent events clearly indicate that they did not understand the import of what occurred there, apparently because of the inability of the eight-year old daughter of appellant to make plain to them what was there said by the deputy auditor. They left the auditor's office believing they were married, and continued in that belief, we assume, in good faith, up until the time of the death of Nick Meton, which occurred in March, 1917. During the whole of this period they lived together and openly held themselves out to the world as husband and wife. During this period appellant preserved the paper upon which there was partly written and partly printed the affidavits made by herself and Nick Meton for a marriage license, given to them by the deputy auditor, believing that paper was evidence of their marriage, though she never read it, not being able to do so, and apparently not considering that there was any necessity for having it read or translated to her.

While appellant's sworn statement made in her application to the industrial insurance department for compensation from the accident fund because of the death of Nick Meton, which statement we assume was made in good faith, showed that she was the widow of Nick Meton, the department not being satisfied with her showing in that behalf, required of her that she

produce a marriage certificate, or some other written evidence of her marriage to Nick Meton. In compliance therewith she produced the paper upon which the affidavits of herself and Nick Meton appeared, which had been given to her by the deputy auditor when they applied for a marriage license, and which she had preserved in the belief that that paper was evidence of her marriage to Nick Meton. It is plain from the evidence that no marriage license was ever issued, that no ceremony of any nature was ever performed, and that no marriage certificate was ever issued by anyone purporting to evidence their marriage.

If a marriage agreement could be lawfully made and the marriage status created in this state as at common law, it is quite probable that appellant and Nick Meton should be held to be husband and wife at the time of his death. It has, however, become the settled law of this state that the marriage status cannot be legally so created, it being necessary to comply with our statute law in order to lawfully create such status. *In re McLaughlin's Estate,* 4 Wash. 570, 30 Pac. 651, 16 L. R. A. 699; *In re Smith's Estate,* 4 Wash. 702, 30 Pac. 1059, 17 L. R. A. 573; *Kelley v. Kitsap County,* 5 Wash. 521, 32 Pac. 554; *In re Wilbur's Estate,* 14 Wash. 242, 44 Pac. 262. The facts here shown render it too plain to admit of argument to the contrary that appellant and Nick Meton did not comply with our marriage statutes in any particular looking to their marriage, other than to make two of the three affidavits required as a prerequisite to the procuring of a marriage license, and the payment of the marriage license fee.

Appellant relies upon our decisions in *McDonald v. White,* 46 Wash. 334, 89 Pac. 891; *In re Sloan's Estate,* 50 Wash. 86, 96 Pac. 684, 17 L. R. A. (N. S.)

960; *Thomas v. Thomas,* 53 Wash. 297, 101 Pac. 865, and *In re Brenchley's Estate,* 96 Wash. 223, 164 Pac. 913, L. R. A. 1917E 968.

In the *McDonald* case, there was an actual marriage ceremony performed by a duly ordained minister, and thereafter the parties lived together for many years, holding themselves out to the world as husband and wife. In the course of the opinion, it is said: "The evidence does not affirmatively show that such a license (meaning marriage license) was issued, nor does it affirmatively show that it was not issued." This seems to be the principal attack made upon the validity of the marriage. It was there held, in substance, that the presumption arising from cohabitation for a period of years, and the fact that there was a marriage ceremony, was sufficient proof of a lawful marriage. It is true that, in the case before us, the cohabitation for a number of years under the belief of lawful marriage would, standing alone, raise a strong presumption of marriage. But the trouble in this case is that the evidence goes too far and shows affirmatively that there never was a lawful marriage. The *Sloan* decision is relied upon because of its recognition of the rule, as therein quoted, that "The presumption of marriage from cohabitation, apparently matrimonial, is one of the strongest presumptions known to the law." This is no greater aid to appellant than the *McDonald* decision. The *Thomas* decision aids appellant to no greater extent. The *Brenchley* decision is well summarized in the syllabus, as follows:

"Where a woman entered into a marriage in good faith without knowledge that the marriage was void because the husband had been divorced within less than six months previously, and they lived together in

good faith .as man and wife and accumulated property by their joint efforts, the probate court has jurisdiction, on the death of the husband, to award one-half of the property to her, as a just and equitable distribution of their joint accumulations.''

Our decision in *Buckley v. Buckley,* 50 Wash. 213, 96 Pac. 1079, 126 Am. St. 900, rests upon the same view of the law as announced in the *Brenchley* decision, though that was a disposition of property in an. annulment of marriage action, which property would have been community property had the marriage been legal. Each of these decisions, while recognizing the marriage as void, disposed of the woman's property rights on broad principles of equity and estoppel invoked against the man, in the one case, and against those claiming under him as heirs, in the other. This is not a case of disposition of property which appellant held in common with Nick Meton. The argument of counsel touching this branch of the case rests upon the good faith of appellant in her cohabitation with Nick Meton, in the belief that she was married to him, and the presumption arising therefrom. But, as already noticed, the evidence in this case proves too much, since it goes to the extent of conclusively showing that there never was any issuance of a license authorizing such marriage, or solemnization of such marriage, or the issuance of a certificate by any one purporting to evidence such marriage. That the presumption arising from such cohabitation in good faith is rebuttable was recognized in *Weatherall v. Weatherall,* 56 Wash. 344, 105 Pac. 822.

Some contention is made in appellant's behalf that she is, in any event, a dependent of Nick Meton, within the meaning of the workmen's compensation act. The

fallacy of this contention is shown by the definition of the word "dependent," found in the act itself, as follows:

"Dependent means any of the following named relatives of a workman whose death results from any injury and who leaves surviving no widow, widower, or child under the age of sixteen years, viz.: Invalid child over the age of sixteen years, daughter, between sixteen and eighteen years of age, father, mother, grandfather, grandmother, stepfather, stepmother, grandson, granddaughter, stepson, stepdaughter, brother, sister, half-sister, half-brother, niece, nephew, who, at the time of the accident, are dependent, in whole or in part, for their support upon the earnings of the workman." Rem. Code, § 6604-3.

Plainly appellant's relation to Nick Meton does not bring her within any of the classes of persons so defined as "dependents." So her claimed right to compensation from the accident fund must be disposed of by the answer to the question, Was she the legal wife of Nick Meton at the time of his death? We see no escape from the conclusion that this unfortunate appellant cannot be awarded compensation from the accident fund as prayed for by her.

The judgment is affirmed.

MAIN, C. J., MOUNT, HOLCOMB, and FULLERTON, JJ., concur.