592

[Nos. 67900-2; 68323-9.   En Banc.]
Argued February 15, 2000.     Decided December 21, 2000.

*In the Matter of* SAMMI PENNINGTON A/K/A EVELYN L. VAN PEVENAGE, *Petitioner*, and CLARK PENNINGTON, *Respondent. In the Matter of the Meretricious Relationship of* DIANA J. CHESTERFIELD, *Respondent*, and JAMES E. NASH, *Petitioner.*

*Catherine Wright Smith* (of *Edwards, Sieh, Smith & Goodfriend, P.S.*); *Charles K. Wiggins* and *Kenneth W. Masters* (of *Wiggins Law Offices, P.L.L.C.*); and *Michael J. McKasy* (of *Troup, Christnacht, Ladenburg, McKasy & Durkin, Inc., P.S.*), for petitioners.

*Edward M. Lane* (of *Smith Alling Lane*); and *Mary L. Gaudio* and *Daniel L. Modeen*, for respondents.

JOHNSON, J. — In these consolidated cases, we must determine whether the legal requirements to establish a meretricious relationship were satisfied so as to allow for equitable relief under our holdings in *Connell v. Francisco*, 127 Wn.2d 339, 898 P.2d 831 (1995) and *In re Marriage of Lindsey*, 101 Wn.2d 299, 678 P.2d 328 (1984). We hold the facts of these cases do not support concluding the existence of stable, cohabiting relationships for either of the parties. Furthermore, we hold neither party made a sufficient showing to justify recovery under other equitable theories. We affirm the Court of Appeals in *Pennington v. Pennington*, 93 Wn. App. 913, 971 P.2d 98 (1999), reverse the Court of Appeals in *Chesterfield v. Nash*, 96 Wn. App. 103, 978 P.2d 551 (1999), and remand both cases to the trial courts.[1]

---

[1] Given this result, it is unnecessary for us to reach the issue of whether the professional goodwill of a business is an asset divisible upon termination of a meretricious relationship.

## FACTS

### Pennington v. Pennington

Respondent Clark Pennington met petitioner Evelyn Van Pevenage (aka Sammi Pennington)[2] in March 1983. At this time, both Pennington and Van Pevenage were married to other people. Van Pevenage's divorce was finalized in December 1983. Pennington separated from his wife in October 1983, but remained married until 1990. Pennington and Van Pevenage began dating each other and, in August 1985, moved in together at Pennington's residence in Kapowsin, Washington. The parties also commenced a sexual relationship.

The Kapowsin residence was an airplane hangar with an unfinished apartment upstairs. Clark Pennington and his wife, Jane Pennington, paid the utilities and mortgage payments. Van Pevenage paid for groceries as well as some home furnishings; her income derived from her work as a bartender and lounge manager at various restaurants. Pennington's income derived from his proprietorship of Exacto, Inc., a corporation manufacturing aircraft and machine parts.

Van Pevenage testified at trial that towards the end of 1986 Pennington proposed marriage to her and gave her an engagement ring. Pennington denied ever proposing marriage and characterized the gift as a "cocktail ring."

In 1987, Pennington purchased a lot in Yelm, Washington. He did so by assuming the underlying real estate contract on the land and agreeing to make cash payments of $700 per month. Pennington made the contract payments from his wages and from rent paid to him by Exacto, Inc. The deed to the property conveyed the land to "Clark M. Pennington, a married man dealing with his separate estate." Ex. 41. Pennington's wife, Jane Pennington, quit-

---

[2] Evelyn Van Pevenage is petitioner's legal name, although the complaint was filed under the name Sammi Pennington. Petitioner will be referred to in this opinion as "Van Pevenage."

claimed her interest in the Yelm property to him in 1988. Pennington then took out a loan solely in his name to pay off the real estate contract and finance construction of a hangar and a new home on the property. Van Pevenage testified she participated in the interior design of the home, although the housing contractor testified he did not take instructions from her. Pennington and Van Pevenage moved into the Yelm home in December 1988. The home loan payments were made from Pennington's Exacto, Inc. wages and from the sale of the Kapowsin residence.

During the course of their relationship, Pennington provided vehicles for Van Pevenage to drive and placed her on his automobile insurance policy.[3] He also named Van Pevenage as the beneficiary of a $50,000 life insurance policy. Van Pevenage acquired credit cards in the name of "Sammi Pennington," and registered Clark and herself in the Yelm telephone book as "Pennington Clark & Sammi." Pennington and Van Pevenage also held joint checking accounts. Pennington denied authorizing Van Pevenage to use his last name for either the telephone book or the credit cards, and testified he had no knowledge she had done so until after the relationship terminated.

Van Pevenage lived with Pennington in the Yelm home continuously until 1991. In April 1991, she moved into an apartment, but returned to the Yelm residence shortly thereafter.[4] Several months later, Pennington suffered a stroke and was hospitalized. Van Pevenage temporarily quit her job to help Pennington around the house, but Pennington returned to work only one week after his release from the hospital. After the stroke, Exacto, Inc. provided Van Pevenage with medical insurance coverage and paid her a salary of approximately $1,000 per month, although Van Pevenage did not have an "active role" in the

[3] All vehicles were purchased by Pennington and titled in his name. After the relationship ended, Pennington signed title over to Van Pevenage on two vehicles he gave her as gifts.

[4] The period of time Van Pevenage lived elsewhere has been estimated between two weeks and three and one-half months.

corporation's business. The salary continued intermittently until 1996. After his stroke, Pennington also gave Van Pevenage signing privileges on the corporate account.

Van Pevenage moved out of the Yelm residence from March 1993 until October 1994. In May 1994, Van Pevenage commenced a sexual relationship with another man, whom she resided with in September of that year. Pennington dated another woman during this time period. Van Pevenage eventually returned to the Yelm residence for one more year, before leaving again in October 1995. Her relationship with Pennington was not sexual during this last year.

In 1996, Van Pevenage filed a complaint in superior court for dissolution of a meretricious relationship between Pennington and herself. The trial court concluded such a relationship did exist, determined that certain property acquired during the relationship should be treated as community property for the purpose of making a just and equitable division of such property, and awarded Van Pevenage a total judgment of $214,200, less amounts already received. Pennington appealed, and the Court of Appeals reversed. *Pennington*, 93 Wn. App. 913. The Court of Appeals held no meretricious relationship existed between Pennington and Van Pevenage, primarily because "during most of the period that the trial court terms 'meretricious,' the parties were not free to marry legally, did not intend to marry, or punctuated their living together with a third party relationship." *Pennington*, 93 Wn. App. at 919. Van Pevenage filed a petition for review with this court, which we granted.

### *Chesterfield v. Nash*

Petitioner James Nash and respondent Diana Chesterfield began a casual dating relationship in August 1986. A few months later the relationship became sexually intimate. Chesterfield worked as a salesperson at Nordstrom, and Nash operated a dental practice he had purchased in

1985. Chesterfield was married, although separated, at the time she began dating Nash. Chesterfield filed for divorce in November 1987. The parties dated from 1986 until 1989, although Nash dated other women during this time period. In July 1989, Nash and Chesterfield moved into a home purchased the previous year by Chesterfield.

While living together, Nash and Chesterfield opened a joint checking account to which they both contributed funds. The account was opened for the purpose of funding living expenses; it was used to pay the mortgage and taxes on the house, as well as groceries, utility bills, and other miscellaneous matters. Contributions to the account were initially equal, but over time Nash contributed more than Chesterfield.[5] Nash testified he also paid nearly all expenses for their numerous vacations, and a disproportionate amount of their dining out expenses. Chesterfield had a profit sharing plan at Nordstrom, but refused to invest those funds in Nash's dental practice unless the two were married. Chesterfield also testified she would not invest in a house with Nash until they were married. Overall, Chesterfield's spending patterns did not change during the period of cohabitation, although she received promotions and pay increases at Nordstrom.

Nash and Chesterfield periodically assisted each other professionally. Nash aided Chesterfield with work-related travel logs and offered her the use of the computer at his dental practice. Chesterfield aided Nash as a temporary dental assistant, helped process accounts payable for several months, and performed word processing tasks. Nash offered to compensate Chesterfield for her help, but she refused.

Nash and Chesterfield ceased living together in October 1993. Chesterfield closed the joint account and made a mortgage payment with the remaining funds. In 1994,

---

[5] Nash testified, based upon his review of canceled checks and bank statements, that he contributed a total amount of $36,046.33 to this account and Chesterfield contributed $15,292.38. Chesterfield testified that Nash contributed more to the account on occasion, but offered no specific estimate.

Nash and Chesterfield briefly reconciled and began dating again, although they did not resume living together. They discussed marriage and Nash purchased a diamond for Chesterfield, but in November 1995 they permanently ended their relationship.

Chesterfield filed a petition for disposition of property rights of a meretricious relationship in superior court. The trial court found Nash and Chesterfield had a meretricious relationship, certain property acquired during that relationship should be treated as community property for the purposes of making a just and equitable division of that property, and a 60/40 percent ratio in favor of Nash was the appropriate basis of division. The trial court entered a judgment of $75,594 plus costs in favor of Chesterfield. Included in the court's valuation and division of property was a $40,000 increase in the goodwill of Nash's dental practice.

Nash timely appealed, and the Court of Appeals affirmed. *Chesterfield*, 96 Wn. App. at 117. The Court of Appeals concluded Nash and Chesterfield had a meretricious relationship primarily because they "lived together continuously in a stable, mutually-supportive relationship for longer than four years, functioning as one would expect a married couple to function with regard to work." *Chesterfield*, 96 Wn. App. at 109. Although the Court of Appeals conceded "Nash's name did not appear on the title of the house in which they lived, and that Chesterfield and Nash did not hold themselves out as being married or commingle their resources for purposes other than living expenses," it found this insignificant. *Chesterfield*, 96 Wn. App. at 109. The Court of Appeals held the trial court properly divided the goodwill of the dental practice. *Chesterfield*, 96 Wn. App. at 111-17. Nash petitioned this court for review, which we granted and consolidated with *Pennington*.

## ANALYSIS

Our Legislature requires a solemnized "civil contract" in

order for a marriage to be valid. RCW 26.04.010(1); *see also* RCW 26.04.050, .120, .130; *Meton v. Indus. Ins. Dep't*, 104 Wash. 652, 655, 177 P. 696 (1919); *In re Estate of McLaughlin*, 4 Wash. 570, 588-89, 30 P. 651 (1892); *Roe v. Ludtke Trucking, Inc.*, 46 Wn. App. 816, 819, 732 P.2d 1021 (1987). Common-law marriage is not recognized under Washington law. *Peffley-Warner v. Bowen*, 113 Wn.2d 243, 249, 778 P.2d 1022 (1989); *In re Estate of Gallagher*, 35 Wn.2d 512, 514-15, 213 P.2d 621 (1950).[6] Wholly unrelated to either kind of marriage, courts have recognized the existence of meretricious relationships, which this court has determined to be stable, cohabiting relationships. *See Connell*, 127 Wn.2d at 346.

For nearly a century, Washington law presumed all property acquired by unmarried cohabitants belonged to the holder of the legal title. *See, e.g., Latham v. Hennessey*, 87 Wn.2d 550, 552-53, 554 P.2d 1057 (1976); *Creasman v. Boyle*, 31 Wn.2d 345, 358, 196 P.2d 835 (1948); *Engstrom v. Peterson*, 107 Wash. 523, 530, 182 P. 623 (1919); *Stans v. Baitey*, 9 Wash. 115, 119, 37 P. 316 (1894). However, even when this presumption applied, courts recognized a variety of exceptions to this presumption. *See Latham*, 87 Wn.2d at 553-54. Among these exceptions were: (1) tracing source of funds, *West v. Knowles*, 50 Wn.2d 311, 313, 311 P.2d 689 (1957); (2) implied partnership/joint venture, *In re Estate of Thornton*, 81 Wn.2d 72, 78-81, 499 P.2d 864 (1972); (3) resulting trusts, *Walberg v. Mattson*, 38 Wn.2d 808, 812-14, 232 P.2d 827 (1951); (4) constructive trusts, *Humphries v. Riveland*, 67 Wn.2d 376, 389-90, 407 P.2d 967 (1965); (5) tenancy in common, *Shull v. Shepherd*, 63 Wn.2d 503, 506, 387 P.2d 767 (1963); and (6) contract theory, *Dahlgren v. Blomeen*, 49 Wn.2d 47, 50-52, 298 P.2d 479 (1956).

In 1984, this court discarded this presumption. *Lindsey*, 101 Wn.2d 299. *Lindsey* involved a couple who commenced

---

[6] Washington will recognize common-law marriages validly entered into in other states, but this exception is not applicable to the present cases. *Peffley-Warner*, 113 Wn.2d at 249 (citing *In re Welfare of Warren*, 40 Wn.2d 342, 344, 243 P.2d 632 (1952); *Gallagher*, 35 Wn.2d at 514-15).

an intimate relationship in 1974, legally married in 1976, and divorced in 1982. *Lindsey*, 101 Wn.2d at 300. The court declined to presume that property acquired *before* the legal marriage belonged to the holder of title, instead holding "that courts must 'examine the [meretricious] relationship and the property accumulations and make a just and equitable disposition of the property.' " *Lindsey*, 101 Wn.2d at 304 (quoting *Latham*, 87 Wn.2d at 554). As a meretricious relationship was conceded by both parties, this court remanded for a determination of how insurance proceeds from a building the couple helped construct should be divided. *Lindsey*, 101 Wn.2d at 306-07.

This court again considered the issue of meretricious relationships in *Connell*, 127 Wn.2d 339. *Connell*, like *Lindsey*, involved an uncontested meretricious relationship. *Connell*, 127 Wn.2d at 346. Connell and Francisco had an intimate relationship and lived together from 1983 until 1990. In 1986, they moved to Whidbey Island, Washington, where Connell managed a bed and breakfast purchased by Francisco's corporation. *Connell*, 127 Wn.2d at 343. We characterized a meretricious relationship as a "stable, marital-like relationship where both parties cohabit with knowledge that a lawful marriage between them does not exist." *Connell*, 127 Wn.2d at 346 (citing *Lindsey*, 101 Wn.2d at 304; Harry M. Cross, *The Community Property Law in Washington (Revised 1985)*, 61 WASH. L. REV. 13, 23 (1986)). The use of the term "marital-like" is a mere analogy because defining meretricious relationships as related to marriage would create a de facto common-law marriage, which this court has refused to do. *See, e.g.*, *Peffley-Warner*, 113 Wn.2d at 249; *Gallagher*, 35 Wn.2d at 514-15; *see also Connell*, 127 Wn.2d at 348 (stating a "meretricious relationship is not the same as a marriage"). Accordingly, we listed five relevant factors to analyze when a meretricious relationship exists: "continuous cohabitation, duration of the relationship, purpose of the relationship, pooling of resources and services for joint projects, and the intent of the parties." *Connell*, 127 Wn.2d at 346 (citing *Lindsey*, 101

Wn.2d at 304-05; *Latham*, 87 Wn.2d at 554; *In re Marriage of DeHollander*, 53 Wn. App. 695, 699, 770 P.2d 638 (1989)). These characteristic factors are neither exclusive nor hypertechnical. Rather, these factors are meant to reach all relevant evidence helpful in establishing whether a meretricious relationship exists. *Connell*, 127 Wn.2d at 346. Thus, whether relationships are properly characterized as meretricious depends upon the facts of each case. *In re Meretricious Relationship of Sutton*, 85 Wn. App. 487, 490, 933 P.2d 1069 (1997).

■ Under *Connell*, we further established a three-prong analysis for disposing of property when a meretricious relationship terminates. First, the trial court must determine whether a meretricious relationship exists. Second, if such a relationship exists, the trial court evaluates the interest each party has in the property acquired during the relationship. Third, the trial court then makes a just and equitable distribution of such property. *Connell*, 127 Wn.2d at 349.

■ While property acquired during the meretricious relationship is presumed to belong to both parties, this presumption may be rebutted. *Connell*, 127 Wn.2d at 351. We have never divorced the meretricious relationship doctrine from its equitable underpinnings. For example, in both *Connell* and *Peffley-Warner*, we stated that "property acquired during the relationship should be before the trial court *so that one party is not unjustly enriched* at the end of such a relationship." *Connell*, 127 Wn.2d at 349 (emphasis added) (citing *Peffley-Warner*, 113 Wn.2d at 252). If the presumption of joint ownership is not rebutted, the courts may look for *guidance* to the dissolution statute, RCW 26.09.080, for the fair and equitable distribution of property acquired during the meretricious relationship. *Connell*, 127 Wn.2d at 350.

In the present cases, we must review and decide whether the trial courts erred in concluding the facts gave rise to meretricious relationships at all. We view this determination as a mixed question of law and fact; as such, the trial

court's factual findings are entitled to deference, but the legal conclusions flowing from those findings are reviewed de novo. *See, e.g., State v. Armenta,* 134 Wn.2d 1, 9, 948 P.2d 1280 (1997) (citing *State v. Thorn,* 129 Wn.2d 347, 351, 917 P.2d 108 (1996)).

Under *Connell,* meretricious relationships are defined as stable relationships evidenced by such factors as continuous cohabitation, duration of the relationship, purpose of the relationship, pooling of resources and services for mutual benefit, and the intent of the parties. *Connell,* 127 Wn.2d at 346. We now apply the *Connell* analytic framework, first applying the factors to the trial court's findings regarding Pennington and Van Pevenage.

*Continuous Cohabitation:* The trial court found Pennington and Van Pevenage began living together in August 1985. Pennington was married to another person until 1990. The parties continued to cohabit until March or April 1991, when Van Pevenage moved out for a period of time. She resumed cohabiting with Pennington until March 1993. Between March 1993 and October 1994, the court found both parties dated other people. The uncontested evidence also establishes Van Pevenage lived with another man during her separation from Pennington. Van Pevenage then moved back in with Pennington for a period of one year. We conclude the continuous cohabitation factor as contemplated by *Connell* has not been established. Under these circumstances, a court would have great difficulty factoring in the property interest of Pennington's former community, as well as factoring in the periods of separation into the division of property. These facts suggest while Pennington and Van Pevenage did cohabit, their cohabitation was sporadic and not continuous enough to evidence a stable cohabiting relationship.

*Duration of the Relationship:* The trial court found the Pennington/Van Pevenage relationship began in October 1983 when the parties began exclusively dating each other. They began living together in August 1985. The trial court also found the parties separated for a short time in 1991,

reconciled, separated again in 1993 through 1994, and reconciled again in October 1994. Thus, their relationship, while not continuous, spanned 12 years. While we agree with the trial court this factor was satisfied, a long-term relationship alone does not require the equitable division of property. Other factors must also justify the need for an equitable division of property acquired by the couple during their relationship.

*Intent of the Parties*: The trial court found Van Pevenage intended to be in a long-term relationship with the expectation of marriage. Naturally, Pennington presented testimony denying his intent to be in a meretricious relationship. Pennington was married to a different woman for the first five years of his relationship with Van Pevenage. More importantly, after his divorce in 1990, Pennington refused to marry Van Pevenage. *Connell* contemplates the mutual intent of parties to be in a meretricious relationship. Pennington's refusal, coupled with Van Pevenage's insistence on marrying, belies the existence of the parties' mutual intent to live in a meretricious relationship. Furthermore, Van Pevenage's intent to live in a stable, long-term, cohabiting relationship is also negated by her own actions, particularly her repeated absences from the Yelm home and her relationship with another man. In this case, the evidence does not support concluding the parties had the mutual intent to form a meretricious relationship.

*Pooling of Resources*: The trial court found Van Pevenage spent money for food, household furnishings, carpeting and tile, and some kitchen utensils. The court also found she cooked meals, cleaned house, and helped with interior decoration. While the evidence establishes the parties shared some living expenses, under *Connell* these facts are not sufficient to show a significant pooling of resources and services for joint projects.[7] As noted above, the relationship

---

[7] When Van Pevenage lived at the Kapowsin residence, Pennington and his wife, Jane Pennington, paid the mortgage and all utilities while Van Pevenage paid for a limited number of household expenses. The second residence in which Van Pevenage and Pennington lived was purchased with Pennington's wages and

had gaps where no expenses were shared. Van Pevenage has no evidence to suggest she made constant or continuous payments jointly or substantially invested her time and effort into any specific asset so as to create any inequities. Given the evidence presented at trial, we cannot conclude the parties jointly invested their time, effort, or financial resources in any specific asset to justify the equitable division of the parties' property acquired during the course of their relationship.

*Purpose of the Relationship*: The trial court found the purpose of the Pennington/Van Pevenage relationship included companionship, friendship, love, sex, and mutual support and caring. Although this was significantly disputed by the testimony offered during the trial, we agree with the trial court's conclusion.

One *Connell* factor is not more important than another. However, when the factors and evidence are taken as a whole, the equitable principles recognized in *Connell* are not satisfied in this case. Therefore, we conclude the sporadic cohabitation, the instability of the relationship, Van Pevenage's insistence on marriage, Pennington's refusal to marry, Van Pevenage's absences from the home and relationship with another man, the gaps where no expenses were shared, and the absence of constant or continuous copayments or investment of time and effort in any significant asset neither evidence a meretricious relationship nor sufficiently justify the fair and equitable distribution of property acquired during the course of the relationship.

We next apply the *Connell* factors to the trial court's findings regarding Chesterfield and Nash to decide whether a meretricious relationship was established.

*Continuous Cohabitation*: The trial court found Chesterfield and Nash moved in together in July 1989 and ceased

---

the sale of the Kapowsin residence. Both the title to the property and the construction loan were in Clark Pennington's name and paid by him. Pennington provided Van Pevenage with automobiles to drive and paid for her automobile insurance. Pennington's company paid Van Pevenage a salary and provided her with medical insurance.

living together in October 1993. The parties briefly reconciled in 1994 through 1995, when they made plans to marry. However, the parties never married as intended and terminated their relationship in November 1995. The trial court was correct in concluding the parties resided together continuously from July 1989 until October 1993. However, when taken as a whole, the parties' cohabitation was not continuous from 1989 through 1995, but was marked by separation and failed reconciliation.

*Duration of the Relationship*: The trial court found Chesterfield and Nash had a relationship lasting four years and three months. Additionally, the parties dated from 1986 until 1989, when they moved in together. However, during the first three years of their relationship, Nash dated other women. Similarly, Chesterfield was married, although separated, at the time she began dating Nash. She did not file for divorce until November 1987. The duration of their relationship could help support a conclusion that a meretricious relationship existed between Chesterfield and Nash.

*Intent of the Parties*: The trial court found Chesterfield and Nash knew they were not married. The trial court found they functioned as one would expect a married couple to function, although the parties did not hold themselves out as spouses. However, the evidence also established Chesterfield was married to another man during her relationship with Nash. These facts are too equivocal to conclusively establish that the parties mutually intended to be in a meretricious relationship.

*Pooling of Resources*: The trial court found Chesterfield and Nash had a joint checking account for living expenses, into which they both deposited money. During their period of continuous cohabitation, Nash assisted Chesterfield with some work-related travel logs. Chesterfield assisted Nash with his office emergencies, his accounts payable, his role as secretary for his study club, and his office correspondence. The court found the parties resided in Chesterfield's home and shared the mortgage payments. However, the parties maintained separate bank accounts. They also purchased

no property jointly. Each maintained his or her own career and financial independence, contributing separately to their respective retirement accounts. When these facts are examined as a whole, the trial court's findings do not fully establish the parties jointly pooled their time, effort, or financial resources enough to require an equitable distribution of property, as contemplated by *Connell*.

*Purpose of the Relationship*: The trial court made no findings as to the purpose of the relationship between Chesterfield and Nash.

When the factors and evidence are balanced as a whole, the equitable principles recognized in *Connell* are not satisfied by the trial court's findings. While the parties' continuous cohabitation and duration of their relationship do evidence a meretricious relationship, the evidence supporting the mutual intent of the parties to be in such a relationship is too equivocal to support such a conclusion. Similarly, the parties maintained separate accounts, purchased no significant assets together, and did not significantly or substantially pool their time and effort to justify the equitable division of property acquired during the course of their relationship. Therefore, we conclude the relationship between Chesterfield and Nash did not constitute a meretricious relationship and the equitable principles recognized in *Connell* are not triggered by these facts.

## CONCLUSION

We, therefore, hold the facts of these cases do not rise to the level of meretricious relationships as envisioned by *Connell* and *Lindsey*. Furthermore, we hold neither party made a sufficient showing to justify recovery under other equitable theories.[8] The Court of Appeals in *Pennington* is

---

[8] To award a community-property-like division of assets in either of the present cases runs counter to the general equitable principles that form the very foundation of the post-*Lindsey* meretricious relationship doctrine. *Cf. Connell*, 127 Wn.2d at 343 (one cohabitant relocated twice and then managed a bed and breakfast owned by other cohabitant); *Lindsey*, 101 Wn.2d at 306-07 (before marrying, cohabitants collaborated on construction of a barn); *Foster v. Thilges*, 61

affirmed. The Court of Appeals in *Chesterfield* is reversed. These cases are remanded to the trial courts for further proceedings consistent with this opinion.

GUY, C.J., and SMITH, MADSEN, ALEXANDER, TALMADGE, SANDERS, IRELAND, and BRIDGE, JJ., concur.

[Nos. 68271-2; 68482-1; 68810-9.   En Banc.]
Argued June 22, 2000.     Decided January 4, 2001.

Wn. App. 880, 881-82, 812 P.2d 523 (1991) (cohabitants pooled incomes, obtained joint loan to build a new home, and collectively purchased other real property). A review of pre-*Lindsey* cases involving claims for equitable relief is also instructive. *See, e.g., Thornton*, 81 Wn.2d at 74-76 (granting recovery under theory of implied partnership when pseudo spouses operated cattle ranching business together for 16 years); *Humphries*, 67 Wn.2d at 389-91 (denying half interest in home to party who cohabited with another party because, "[i]n order to have such an equitable claim, appellant must show that there has been some inequitable conduct . . . ."); *Omer v. Omer*, 11 Wn. App. 386, 392-93, 523 P.2d 957 (1974) (awarding relief under constructive trust theory when parties were married abroad but later divorced for naturalization purposes, and plaintiff regularly gave her wages to defendant to purchase property titled in his name).