

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | |
| | ) | No.  38002-5-III |
| REBECCA N. DEBOER, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| and | ) | UNPUBLISHED OPINION |
| | ) | |
| JOSHUA M. DEBOER, | ) | |
| | ) | |
| Appellant. | ) | |

FERRERA, J.[*] — Rebecca DeBoer and Joshua DeBoer married after an eight-year

dating relationship and then separated after three months of marriage.[1] After the

dissolution trial, the trial court determined that the residence Rebecca purchased prior to

the marriage and that the parties lived in during the marriage was Rebecca's separate

property and distributed the sale proceeds of that residence to her. At trial and now on

appeal, Joshua challenges the characterization of the residence as separate property by

alleging the existence of a committed intimate relationship. The trial court declined to

find a committed intimate relationship based on the totality of the circumstances. The

record supports the trial court's factual findings which, in turn, support its legal

---

[*] Judge Kristin Ferrera is serving as judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.

[1] Without intending any disrespect, the parties are hereafter referred to by their first names for the sake of clarity.

conclusions. Where this court does not weigh the evidence or credibility, the conclusion that a committed intimate relationship did not exist was not erroneous.

FACTS

Rebecca Funk DeBoer and Joshua DeBoer first dated in the spring of 2006. Joshua worked as a licensed real estate agent from 2007 forward. Both traveled individually and extensively for school during their relationship. In January 2009, they moved in together in Yakima, Washington. However, Rebecca moved to Spain from the fall of 2009 to the spring of 2010. Mid-2010, Rebecca returned to Yakima and moved back in with Joshua. In 2011, Joshua moved to Puerto Rico for six months and then returned to Yakima where they lived together until May 2012. During the time they lived in Yakima, they split the expenses 50/50 with nothing shared.

Throughout the dating relationship, the couple communicated regularly and visited each other often. However, they were not intimately exclusive. Rebecca described the relationship as "tumultuous, toxic at times, up and down" and "rocky" due to infidelity. Report of Proceedings at 21, 23. However, both Rebecca and Joshua agreed that they never broke up during the period they dated. They discussed marriage throughout the relationship but Joshua was anti-marriage, did not want the government involved in their relationship, and did not want to be tied to someone legally.

2

In 2012, the parties had a symbolic marriage ceremony in Mexico but Joshua still did not want a legal marriage. After the ceremony, the parties did not mix their finances or share any accounts, debts, or investment projects.

Later in 2012, Rebecca purchased a house located in Yakima, Washington. The home and mortgage debt were solely titled in Rebecca's name. She never refinanced or added Joshua's name to the deed. Both parties agree that Rebecca paid the entire $10,000 down payment with inheritance money. Joshua did not contribute any funds to the purchase of the home but he did act as the real estate agent for the purchase of the property and received an agent commission on the home purchase. Joshua did not disclose any interest in the home purchase at the time, which he knew RCW 18.86.020 required if he was an owner in the home. Joshua placed the commission into his separate bank account and did not share it with Rebecca.

Rebecca and Joshua moved into the house and lived together. Rebecca paid the $1,135 per month mortgage payment plus taxes and insurance from her bank account. Joshua paid her $400 per month as rent. Rebecca testified that they did not split the rent 50/50 anymore because the house was clearly her investment, she was the only one building equity in the house, and Joshua wanted nothing to do with it. To split other house expenses 50/50, Joshua added them to the rent check that he wrote her each month. While they lived in the home, some home improvements were done. Rebecca used her credit card to pay for paint, cabinets, flooring, landscaping, and a concrete patio. Joshua

did not contribute any funds to home improvements. Rebecca testified at trial that Joshua was adamant the house was Rebecca's investment so she should pay for the home improvements. Joshua and a friend provided 200 to 300 hours of labor to install the flooring and the patio. The record does not indicate the cost of the improvements or any increase to the value of the home.

In August 2013, Rebecca and Joshua held themselves out as married at a reception for family and friends in Yakima and people thought they were getting married. However, Joshua and Rebecca never had joint accounts or joint debt. Joshua indicated that the relationship never impacted how he ran his finances. In 2016, Joshua moved to Pullman, Washington for six months to complete his degree. Joshua was not certain if he continued paying $400 per month to Rebecca while in Pullman and had no documentation of any payments.

In early 2017, Rebecca got a job teaching for the U.S. Department of Defense stationed in Korea. Joshua needed to become her legal dependent to live with her in Korea, therefore, they legally married in May 2017.[2] This wedding was not planned far in advance. Rebecca ultimately left for Korea alone because Joshua incurred a pending felony criminal charge that prevented him from joining her.

---

[2] After marriage, Rebecca listed Joshua as a beneficiary on her retirement account, but this is irrelevant to the premarital committed intimate relationship. No other beneficiary designations appear in the record.

4

In August 2017, Joshua signed a written rental agreement allowing him to stay in the house in Yakima. He agreed to pay $1,135 per month. He signed the agreement to please Rebecca because she was angry. He followed the rental terms and deposited checks to Rebecca's account. The relationship ended after this in 2017.

In 2018, Rebecca listed the home for sale using Joshua as the listing agent. Joshua filled out the listing contract with Rebecca as owner and himself as tenant. He testified that he did not disclose any ownership interest in the house because he did not understand his legal rights. At trial, he claimed that it was always understood that it was their home together and absolutely believed he had an interest. And yet, he did not disclose an interest in the home as the listing agent. He did not suggest another agent because if they sold it through Joshua, they could take the proceeds of his 7 percent commission and split them equally. Joshua did not have any concerns that this was an ethical issue. However, he did not get a sales commission since the house did not ultimately sell through him. The house later sold through another agent for $119,000 and the proceeds were placed in trust pending resolution of the divorce.[3] The parties have no children. No information was provided to the court of total retirement contributions by the parties.

The court ultimately found that a committed intimate relationship (CIR) did not exist primarily focusing on the lack of pooled resource factor. The trial court also inferred

---

[3] Rebecca initially offered Joshua a settlement but withdrew that offer. Joshua's argument regarding this offer should not be considered. ER 408.

a lack of commitment from the behaviors of the parties, particularly failure to plan for the future and an apparent lack of stability. Beyond the five *Connell*[4] factors, the court found the infidelity of both parties indicated a lack of commitment. The trial court only considered Joshua's testimonial contradictions and misconduct as a real estate agent in connection to finding Joshua not credible. The court concluded that the marriage lasted three months, the house proceeds were Rebecca's separate property, and distributed the house proceeds to Rebecca. As a matter of equitable distribution, the court alternatively held that even if a CIR existed, Joshua was not entitled to any of the house proceeds. Joshua timely appealed.

## ANALYSIS

STANDARD OF REVIEW

Whether a parties' relationship was a CIR is a mixed question of law and fact reviewed de novo with deference to the trial court's unchallenged and supported findings of fact. *In re Marriage of Pennington*, 142 Wn.2d 592, 602-03, 14 P.3d 764 (2000). With respect to challenged findings, we review whether they are supported by substantial evidence that would persuade a rational, fair-minded person of the finding's truth. *Muridan v. Redl*, 3 Wn. App. 2d 44, 54-55, 413 P.3d 1072 (2018). "In our review, we neither weigh the evidence nor judge the credibility of the witnesses." *Id*. If substantial

---

[4] *Connell v. Francisco*, 127 Wn.2d 339, 898 P.2d 831 (1995).

evidence supports the trial court's findings of fact, then the reviewing court determines whether the findings support the trial court's conclusions of law but, beyond this determination, we do not substitute the trial court's judgment with our own. *In re Marriage of Greene*, 97 Wn. App. 708, 714, 986 P.2d 144 (1999).

COMMITTED INTIMATE RELATIONSHIP

A CIR "is a stable, marital-like relationship where both parties cohabit with knowledge that a lawful marriage between them does not exist." *Connell*, 127 Wn.2d at 346. "The CIR doctrine is a judicially created doctrine used to resolve the property distribution issues that arise when unmarried people separate after living in a marital-like relationship and acquiring what would have been community property had they been married." *In re Kelly*, 170 Wn. App. 722, 732, 287 P.3d 12 (2012). Based in equity, the CIR doctrine protects the interests of unmarried couples who acquire property during their relationship by preventing unjust enrichment when the relationship ends. *In re Pennington*, 142 Wn.2d at 602.

Five factors are relevant to the existence of a CIR: "continuous cohabitation, duration of the relationship, purpose of the relationship, pooling of resources and services for joint projects, and the intent of the parties." *Connell*, 127 Wn.2d at 346. The factors are non-exclusive, and unweighted. *Pennington*, 142 Wn.2d at 602, 605. Ultimately, the existence of a CIR depends on all the relevant facts of each case. *Id*.

Here, the court found that a CIR did not exist and distributed the house proceeds to Rebecca as her separate property. Joshua challenges the court's finding that the house was Rebecca's separate property and asserts an equitable interest in the house arising from the existence of a CIR at the time of its purchase. He otherwise fails to specifically challenge any other factual finding of the court rendering them verities on appeal. Nonetheless, the trial court's findings are supported by the record:

*Continuous Cohabitation*: Neither party challenges the trial court's finding that the parties cohabitated for several years.

*Duration of the Relationship*: The parties were together from mid-2009 until at least August 2017. Apart from the dispute as to when in 2017 the relationship ended, the parties do not dispute the duration of the relationship.

*Purpose of the Relationship:* The trial court found that the purpose of the relationship was somewhere between "friends with benefits" and marriage. Clerk's Papers (CP) at 25. The trial court found that "[b]eyond their day to day lives, there did not seem to be much other purpose to their relationship." CP at 25. Substantial evidence supports the trial court's findings that the parties did not engage in any long-term financial or family planning for their future together. Even though they gave others the impression that they were getting married at a spiritual ceremony, all their other behavior over the course of the relationship did not indicate commitment.

8

*Pooling of Resources*: The record supports that the parties never pooled their resources and, in fact, kept their resources meticulously separate. The trial court found the parties "never had any joint bank accounts, credit cards, or debts." CP at 26. Additionally, after Rebecca bought the house, Joshua paid her $400 per month rent. Although Joshua claimed otherwise at trial, the trial court found he was not credible and the evidence did not support his claim. This Court defers to the trial court on issues of witness credibility.

*Intent*: The parties provided no direct evidence of either party's intent of commitment at trial. The trial court inferred intent based on what the parties did and did not do, weighing the fact that the parties held a spiritual wedding ceremony and expressed to others that they were married, against the evidence that the parties did not pool resources or jointly plan for a future together, did not discuss whether they would have children together, did not name each other in their wills, and did not name the other as insureds on their insurance policies. This court does not weigh the evidence and gives deference to the trial court's finding that the intent was to enjoy each other's company while the relationship was working but not to commit to anything long-term because it is supported by substantial evidence.

In addition to the five *Connell* factors, the trial court considered whether the parties were committed to each other in a manner that goes beyond merely an "intimate relationship." CP at 27. In this analysis, the trial court mentioned that the parties'

infidelity during the relationship as well as the tumultuous nature of the relationship provided additional reasons to conclude a committed intimate relationship did not exist between these two parties. While marital fault is not appropriate for consideration, infidelity by both parties here was merely considered as additional evidence of mutual intent (or lack thereof) of commitment. *In re Marriage of Muhammad*, 153 Wn.2d 795, 804, 108 P.3d 779 (2005). Even absent these additional considerations, substantial evidence supported the trial court's conclusion after considering the five *Connell* factors.

CONCLUSION

The trial court weighed the facts Joshua cites in support of his claim that a CIR existed against the numerous other considerations in the record that contradict a finding of a CIR. This Court on review does not weigh the evidence. Substantial evidence in the record supports the trial court's conclusion that a CIR did not exist between the parties. This Court affirms the trial court's decision.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Ferrera, J.P.T.

WE CONCUR:

_____          _____
Lawrence-Berrey, A.C.J.                                    Pennell, J.

10