**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| In the Matter of the Committed Intimate Relationship of:<br><br>SIDNEY ROBERTSON,<br><br>                      Appellant,<br><br>    and<br><br>NICHOLAS DAVID KENLON,<br><br>                    Respondent. | No. 87308-3-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

MANN, J. — Sidney Robertson petitioned to dissolve a committed intimate relationship (CIR) with Nicholas Kenlon and divide their property and debts. Sidney appeals the trial court's findings of fact, conclusions of law, and decree that she failed to prove facts sufficient to establish a CIR.[1] Sidney argues that the trial court's decision was based on an incorrect legal standard and that several of its findings are not supported by substantial evidence. We affirm.

I

Sidney and Nick met in 2013 when they were both college students in Daytona, Florida. At the time, Sidney and Nick were both in the process of getting divorced from their respective partners and were engaged in an on-and-off sexual relationship.

---

[1] In their briefs, the parties refer to themselves by their first names, Sidney and Nick. We follow their lead. No disrespect is intended.

In 2014, Nick moved from Daytona to Jacksonville, Florida. Sidney followed Nick to Jacksonville, renting a separate home for herself and her young daughter from a prior marriage. Sidney would show up unannounced at Nick's work or come to his apartment with her daughter, telling him that she had no food or that she needed dinner for her daughter. Sidney and her daughter would stay the night and then continue to stay until Nick asked them to leave. That pattern continued until early 2015, when Nick moved into a new apartment in Jacksonville purposely not telling Sidney its location. At trial, Nick testified that he was done with the relationship and that he was seeing someone else at the time.

Despite Nick's desire to move on, he once again became involved with Sidney after the Florida Department of Children and Families (DCF) began investigating her over allegations of child abuse. In mid-2016, Nick was approached by DCF to act as an adult visitation supervisor for Sidney and her daughter. Nick "agreed specifically" so that "Sidney wouldn't lose her daughter." Shortly after, Sidney also told Nick that she would lose custody of her daughter unless they moved in with him, which he agreed to. Nick testified that DCF made one visit to his apartment after Sidney and her daughter moved in. Because Nick did not hear from DCF again, he believed Sidney when she told him that the case against her had been closed.

After quitting his job in Jacksonville, Nick moved to Washington with Sidney in early October 2016. They agreed to split the cost of a room at an extended-stay hotel in Everett. Nick found a job working for Skagit Regional Health, while Sidney worked at B/E Aerospace for about four to six months before being let go.

-2-

In early 2017, Sidney was arrested because of the ongoing DCF case, and her daughter was removed from her custody and placed into foster care. That came as a surprise to Nick, given that Sidney had assured him that the DCF case against her had been closed. Nick paid Sidney's bail to get her released from jail because he was concerned that if he "abandoned her . . . she would be out on the streets[,]" and he was trying to "help her not be in a worse situation."

In an attempt to "make her[self] look better[,]" Sidney asked Nick if she could tell DCF that they were engaged. Nick agreed because he "was trying to help Sidney with the whole [DCF] issue." Nonetheless, Nick testified that they did not have that type of relationship, and he did not see himself marrying Sidney.

In the meantime, Sidney and Nick moved into an apartment in Smokey Point in May 2017. Nick paid for most of their expenses because Sidney's primary focus was working on getting her daughter back and dealing with DCF.[2] Sidney's lack of employment was a constant source of conflict between them. But despite her limited income, and because Nick wasn't ready to start looking for a home, Nick told Sidney that it was her "job" to find a home to live in "so that she would have something to occupy her time" and to avoid fighting.

In September 2017, Sidney found a vacant lot for sale in Arlington and filled in the paperwork to start a loan application process to purchase the property. Ultimately, however, there was no way to jointly finance the property or jointly be on the title unless Sidney and Nick got married—something that Nick testified he had no intention of doing.

---

[2] Sidney's daughter was eventually returned to her in January or February 2018.

In September 2018, Nick successfully applied for a VA loan to purchase the Arlington property.[3]  Nick was the sole borrower on the loan documents and the sole title holder on the statutory warranty deed to the property.  In January 2019, Nick purchased a manufactured home to be placed on the  Arlington property using the same loan.  Sidney and Nick moved into the home.  Just like when they lived at the Smokey Point apartment, Nick paid for most of their expenses, including all the mortgage payments.  The parties had no joint bank accounts, made no joint purchases, and did not commingle any of their income.

In September 2021, Nick moved out, testifying that he realized he was in a toxic relationship with Sydney due to constant fighting and arguing, and her not contributing much to their livelihood.  Nick also testified that he repeatedly told Sidney that their relationship was over and that she needed to leave and move out, but that she refused.  While Nick stayed with a friend in Oak Harbor, Sidney began "following [him] a lot."  After Nick moved to an apartment in Sedro-Woolley, Sidney continued to follow him and show up at his work.  Sidney was eventually criminally charged for stalking, and a pretrial stalking protection order was entered against her on February 8, 2022.[4]

Legal trouble notwithstanding, Sidney continued to live in the Arlington home with her daughter without contributing to the $2,500 monthly mortgage payment.  Sidney also failed to pay for utilities, which were in Nick's name, and allowed them to go to collections.  On top of the mortgage, Nick paid for his own apartment and personal bills,

---

[3] A VA loan is a mortgage option backed by the Department of Veteran Affairs available to veterans, service members, and surviving spouses.  VA loans can be used to purchase a single-family home, condominium, multi-unit property, manufactured home, or new construction. https://www.veteransunited.com/va-loans/.

[4] The stalking protection order against Sidney expired on December 20, 2022.

which sometimes forced him to let the Arlington property go into foreclosure. That remained the status quo for almost 19 months.

Eventually Nick hired an attorney "to have Sidney evicted from the home because she would not move out on her own." After receiving multiple continuances in the eviction action, Sidney agreed to vacate the home on April 1, 2023.

On August 23, 2022, while Nick was trying to get Sidney evicted, Sidney filed a complaint in Snohomish County Superior Court to dissolve the CIR and divide their property and debts. Sidney alleged that she was entitled to the "sole rights to sell" the Arlington property, including the home, and retain 90 percent "of the sale proceeds— after the mortgage was settled." In response, Nick denied the existence of a CIR, arguing that (1) there was no long-term intent beyond initial cohabitation, (2) Sidney filed the complaint in bad faith to avoid ejectment, and (3) she had been unjustly enriched at his expense.

After a two-day bench trial, the trial court entered written orders incorporating its oral findings and conclusions on September 16, 2024, decreeing that Sidney "did not prove, by a preponderance of the evidence at trial, facts sufficient to establish that the parties were in a [CIR]." The trial court awarded each party the property that was in their name, specifically awarding the Arlington property and home to Nick.

Sidney appeals.

II

Sidney argues that the trial court erred by applying an incorrect legal standard for the existence of a CIR. We disagree.

-5-

A

The existence of a CIR presents a mixed question of law and fact.  In re Marriage of Pennington, 142 Wn.2d 592, 602, 14 P.3d 764 (2000).  "[A]s such, the trial court's factual findings are entitled to deference, but the legal conclusions flowing from those findings are reviewed de novo."  Pennington, 142 Wn.2d at 602-03.  When the trial court has weighed the evidence, our role is to determine whether substantial evidence supports its findings of fact and, if so, whether the findings in turn support its conclusions of law.  In re Marriage of Greene, 97 Wn. App. 708, 714, 986 P.2d 144 (1999).  A reviewing court does not "substitute [its] judgment for the trial court's, weigh the evidence, or adjudge witness credibility."  Greene, 97 Wn. App. at 714.

A CIR is a stable, marital-like relationship in which both parties live together with the knowledge that a lawful marriage does not exist between them.  Pennington, 142 Wn.2d at 601 (citing Connell v. Francisco, 127 Wn.2d 339, 346, 898 P.2d 831 (1995)).  Courts must consider five factors in determining whether a CIR exists: (1) continuous cohabitation, (2) the duration of the relationship, (3) the purpose of the relationship, (4) pooling of resources and services for joint projects, and (5) the intent of the parties.  Pennington, 142 Wn.2d at 601 (citing Connell, 127 Wn.2d at 346).  These characteristic factors are neither exclusive nor are they hypertechnical.  Pennington, 142 Wn.2d at 602.  Said differently, no single factor is more important than another, and the circumstances of each case must be examined to determine whether a CIR exists.  Pennington, 142 Wn.2d 602-03, 605.

The CIR doctrine sounds in equity; it protects "the interests of unmarried couples who acquire property during their relationship by preventing the unjust enrichment of

one at the expense of the other when the relationship ends." In re Committed Intimate Relationship of Amburgey, 8 Wn. App. 2d 779, 787, 440 P.3d 1069 (2019). Thus, the existence of a CIR depends on whether the nature of the relationship justifies "the need for an equitable division of property acquired by the couple during their relationship." Pennington, 142 Wn.2d at 604.

B

1

Sidney does not dispute that the trial court analyzed the Connell factors in making its decision. In addition, Sidney largely does not dispute the trial court's findings concerning each of the factors. Instead, Sidney's challenge of the trial court's decision rests chiefly on the argument that the trial court applied the wrong legal analysis by relying too heavily on whether the relationship was "marriage-like." We disagree.

Sidney relies on Vasquez v. Hawthorne, 145 Wn.2d 103, 107-08, 33 P.3d 735 (2001), to assert that whether a relationship is marriage-like is "not the legal test for the existence of a [CIR]." But her reliance is misplaced. In Vasquez, our Supreme Court reversed a decision that two men could not be in a CIR because CIRs are marital-like, and because persons of the same sex could not be legally married at the time, a CIR could not exist between members of the same sex. 145 Wn.2d at 105. In doing so, Vasquez held that "[CIR] claims are not dependent on the 'legality' of the relationship between the parties, nor are they limited by the gender or sexual orientation of the parties[,]" and the term "'marital-like'. . . is a mere analogy." 145 Wn.2d at 107 (quoting Pennington, 142 Wn.2d at 601). Thus, despite Sidney's assertions, the upshot of Vasquez is not a rejection of the marital-like nature of a CIR, but rather of a CIR

analysis where the parties' ability to legally marry is dispositive. Indeed, CIR claims "must be analyzed under the specific facts presented in each case." Vasquez, 145 Wn.2d at 107-08. Sidney's argument that the trial court erred as matter of law by focusing on whether the relationship was marriage-like fails.

2

In addressing the third Connell factor—the purpose of the relationship—the trial court found that, generally, the purpose was "companionship, support, and intimacy," while the primary purpose was to "provide a home base" for Sidney and her daughter. Notably, however, the trial court found that "[a]t no time" was the relationship "marriage-like." Sidney contends that the trial court erred as a matter of law by focusing on the fact that the she and Nick did not marry to mitigate the DCF case against her. We disagree.

Sidney is correct that one of the facts the trial court pointed to in addressing the purpose of the relationship factor is that her DCF case could have been mitigated by them getting married, and yet no marriage took place. Nonetheless, the trial court offered multiple other reasons in support of its finding, including:

> the purchasing of the manufactured home does not demonstrate a [CIR]. I would point out, the parties did not even engage in any kind of joint venture on the property. During the time that they were together, there was no attempt to add [Sidney]'s name to the title or the loan documents or anything whatsoever.
> . . . .
> [Sidney] indicated that she wanted 90 percent of the equity value of the home. That's not equitable. It's further demonstration of the implication that this was not a marriage-like relationship.
> . . . .
> [N]o friends came forward to demonstrate that there was such a [CIR]. There were no school records, rent records, records of joint accounts,

> either debts or assets, testimony of anyone that these parties held themselves out in a marriage-like relationship.
>
> . . . .
>
> I find also that the domestic violence situation that took place in 2020 to 2021 underlies the nature of this relationship, that it was volatile, potentially toxic, and one-sided.
>
> . . . .
>
> During the course of the relationship, [Sidney] was on Navy public aid, Navy benefit. She worked sporadically. All the economics of this relationship came from [Nick]. [Sidney] made no effort to improve that situation, and that goes to the purpose of their relationship.

Based on that, while the parties' failure to marry alone might not have supported the trial court's decision that the purpose of the relationship was not marriage-like, the trial court's multiple unchallenged findings support its determination.

3

Sidney also contends that the trial court compounded its error by concluding that her failure to contribute financially to the relationship weighed against the existence of a CIR based on the purpose of the relationship factor. That, Sidney asserts, conflated the purpose factor with Connell's fourth factor, the pooling of resources and services for joint projects. We disagree.

As we already explained, the Connell factors "are neither exclusive nor hypertechnical. Rather, these factors are meant to reach all relevant evidence helpful in establishing whether a [CIR] exists." Pennington, 142 Wn.2d at 602. Indeed, "[o]ne Connell factor is not more important than another[,]" and the "evidence [is] taken as a whole" to determine whether a CIR exists, such that "the fair and equitable distribution of property acquired during the course of the relationship" is justified. Pennington, 142 Wn.2d at 605. That is what the trial court did here: a holistic analysis of the evidence to determine that no "stable, marital-like relationship" existed between the parties. See

Connell, 127 Wn.2d at 346. Sidney's contention that the trial court erroneously "collapsed" the two factors is unavailing.

III

Sidney next argues that three of the trial court's findings of fact about the home were unsupported by substantial evidence, thus rendering erroneous its conclusion that the pooling of resources factor weighed against the existence of a CIR. We disagree.

Sidney first challenges the trial court's finding that "[t]here was no testimony of any contribution made by [Sidney] to the down payment." Sidney asserts that the finding was unsupported by substantial evidence because there was no down payment for her to contribute to. Sidney relies on Nick's testimony: "[a]s far as I know, the VA loan that I was qualified for did not require a down payment." But the trial court was correct: there was no evidence that Sidney contributed to a down payment. Moreover, it is undisputed that the property and home were purchased using Nick's VA loan and that he alone made payments on that loan. Accordingly, the trial court properly considered Sidney's failure to financially contribute toward the property and home as evidence that they did not pool resources to justify awarding her an equitable interest.

For instance, in Pennington, the trial court found that while Van Pevenage "cooked meals, cleaned [the] house," "helped with [the] interior decoration[,]" and "shared some living expenses[,]" those facts were "not sufficient to show a significant pooling or resources and services for joint projects." 142 Wn.2d at 604. In concluding that the parties were not in a CIR, the court noted that Van Pevenage presented "no evidence to suggest she made constant or continuous payments jointly[,] or substantially invested her time and effort into any specific asset so as to create any

-10-

inequities . . . to justify the equitable division of the parties' property acquired during the course of their relationship." Pennington, 142 Wn.2d at 605.

Sidney next challenges the trial court's finding that "[d]uring the time that they were together, there was no attempt to add [Sidney]'s name to the title or to the loan documents or anything whatsoever." Sidney asserts that the finding was unsupported by substantial evidence because it is undisputed that she and Nick jointly applied for a loan that was denied because they were not married. While the record confirms that the parties initially applied for a loan jointly, that application was denied. In the end, they did not acquire the property and home together. The property and home were purchased by Nick alone with a loan that he solely repaid. There is no evidence the parties attempted to add Sidney's name to the title or loan documents after the initial unsuccessful application.[5] Viewing the evidence in the light most favorable to Nick, we conclude that the second challenged finding is supported by substantial evidence.

Sidney also challenges the trial court's finding that "the parties did not even engage in any kind of joint venture on the property." Sidney argues that (1) she offered undisputed evidence that she secured a gift from her sister to finance a home loan and (2) she played a substantial part in getting the home sited and assembled. Sidney specifically relies on a gift letter affidavit signed by herself and her sister, describing a gift in the amount of $2,321.59 for the purpose of assisting Sidney "in the closing of a real estate loan." But nothing in the record shows that the money actually went toward

---

[5] We also reject Sidney's argument that the trial court erred because the focus of the second challenged finding was whether there was any attempt to take out a joint home loan. As we already explained, the focus of the trial court's CIR analysis as a whole was on whether "an equitable division" of the home was justified. Pennington, 142 Wn.2d at 604.

the home, or that Sidney herself made any financial contribution toward the home. While the trial court acknowledged that Sidney put some effort into the home by "potentially finding it and maybe working on the loan application in the first instance," it ultimately concluded that it was not enough to show that Sidney and Nick pooled their resources for joint projects to establish a CIR that justified the "equitable division of property acquired by the couple during their relationship." Pennington, 142 Wn.2d at 604. Thus, looking at the evidence in the light most favorable to Nick, we conclude that the third challenged finding is supported by substantial evidence.

We affirm.[6]

_Mann, J._

WE CONCUR:

_____          _____

---

[6] Because we affirm the ruling below, we do not address Sidney's request for a retrial before a different judge on remand.