244 P.3d 26 (2010)
In re the Meretricious Relationship of Jeremy R. LONG, Respondent, and
David R. FREGEAU, Appellant, and
Kirsten Fregeau, Intervener Appellant.
No. 28377-1-III.
Court of Appeals of Washington, Division 3.
December 14, 2010.
*27 Samuel Benton Gordon, Gordon Jones PLLC, Seattle, WA, Travis S. Jones, Law Office of Travis S. Jones PLLC, Spokane, WA, for Appellant.
Gary R. Stenzel, Gary R. Stenzel PS, Spokane, WA, for Respondent.
Kenneth H. Kato, Attorney at Law, Spokane, WA, for Appellant Intervenor.
BROWN, J.
¶ 1 Dr. David R. Fregeau appeals the trial court's equitable property division to Jeremy R. Long and the meretricious relationship determination from which it flowed. The parties use different, sometimes confusing terms to describe their relationship. Our Supreme Court has noted "meretricious" carries negative and derogatory connotations and has chosen to substitute "committed intimate relationship" for meretricious relationship. Olver v. Fowler, 161 Wash.2d 655, 657 n. 1, 168 P.3d 348 (2007). Intimacy and commitment are just two non-exclusive relevant factors a trial court can consider in deciding if equity applies to support an equitable property division.
¶ 2 Here, the parties agree they had an intimate relationship neither disparages; *28 and, they view the meaning of commitment differently. The parties largely agree on the facts, but they disagree if those facts sufficiently raise equity to support an equitable property division. Characterizing their liaison as merely a dating relationship, Dr. Fregeau mainly contends his intimacy with Mr. Long lacked mutual commitment and sufficient duration to justify equitable relief. He asserts equity does not apply, and if it does, the property division is incorrect. Given this background, we use the phraseology "equity relationship" as a neutral, more accurately descriptive, substitute term in analyzing the common fact-equity issues found in this subject area.
¶ 3 We hold the trial court did not err in analyzing the relevant factors and concluding an equity relationship existed. We affirm the equitable property division, except for consideration of one separate retirement account, the Rockwood plan, belonging to Dr. Fregeau that does not show any contributions during the relevant time. We reject arguments from Dr. Fregeau and his intervening daughter, Kirsten Fregeau (holding part title in one property), that the court lacked jurisdiction over that property because she was not joined as a necessary party. Accordingly, we affirm and remand for an amended property division order.

FACTS
¶ 4 Jeremy Long and David Fregeau, a married man, met in March 1999 and soon began dating. In fall 1999, Dr. Fregeau left his family home and moved into Mr. Long's home on Valleyway where they lived until 2003. Dr. Fregeau formally separated from his wife in September 2000. For some time, Dr. Fregeau stayed at Mr. Long's house without paying rent. While there, the pair shared living expenses.
¶ 5 In fall 2002, the pair found an investment property, the Wellesley house. Title and financing was put in the names of Mr. Long and Dr. Fregeau's daughter, Kirsten, as a divorce accommodation to Dr. Fregeau. Ms. Fregeau paid rent to Mr. Long while she lived at the Wellesley house. Mr. Long paid the mortgage. At times, Dr. Fregeau paid Kirsten's rent. After Kirsten moved out, the pair jointly rented the Wellesley house to others.
¶ 6 In 2003, Mr. Long and Dr. Fregeau decided they wanted a larger house on Havana and worked together to acquire it. Because of Department of Housing and Urban Development (HUD) restrictions, Mr. Long could not take title, so while he paid the earnest money and each paid one-half of the down payment, title was put in Dr. Fregeau's name. Before moving into the Havana house, the pair equally shared renovation expenses and later shared other improvement expenses, except for disputed 2004 landscaping expenses paid by Dr. Fregeau. The pair continued living together at the Havana house and sharing expenses, except for a three-month separation beginning March 2006. Dr. Fregeau's children occasionally visited.
¶ 7 In September 2006, Mr. Long added Dr. Fregeau to one of his bank accounts so Dr. Fregeau could deposit $48,000 to conceal the funds from his wife. Mr. Long transferred the money to Dr. Fregeau as needed for his bills. Dr. Fregeau removed his remaining funds from the account after the parties finally separated.
¶ 8 The parties agree their relationship was loving and intimate. They cared for each other during illnesses and after surgeries, spent holidays with their families, purchased furniture and housewares, worked on their joint and separate rental properties, and vacationed together. Dr. Fregeau paid for vacationing if Mr. Long could not afford it. The parties often discussed their future together. Mr. Long named Dr. Fregeau as a contingent beneficiary on a workplace retirement plan. On the other hand, the pair did not engage in mutual estate planning or buy and insure vehicles together.
¶ 9 In September 2001, after Dr. Fregeau discovered Mr. Long's infidelity, some months elapsed without full intimacy, although the pair continued to sleep in the same bed and remained otherwise intimate. Dr. Fregeau later admitted a similar indiscretion. Dr. Fregeau testified Mr. Long's sexual behavior was an ongoing concern and argued it showed lack of commitment. In *29 March 2007, Dr. Fregeau suspected Mr. Long was again cheating and later confronted him. Mr. Long minimized his behavior as merely recreational and without diminished commitment to Dr. Fregeau.
¶ 10 Dr. Fregeau divorced in February 2007. That month, Washington allowed same-sex registered domestic partnerships. The pair attended a seminar on the subject. In summer 2007, they attended joint counseling to maintain their relationship. During this time, Dr. Fregeau filled out papers to register as a domestic partnership, but Mr. Long declined. At trial, Dr. Fregeau asserted the relationship had ended in July 2007, even though Mr. Long permanently left the Havana house in February 2008.
¶ 11 In March 2008, Mr. Long sued for an equitable property division. Before trial, the parties mediated most property issues. After a bench trial, the judge concluded an equity relationship existed and considered the parties' remaining property and debt the Havana house, the Wellesley house, and the parties' retirement accounts. The court awarded one-half of Wellesley to Mr. Long, noting the remaining one-half was "titled to Kristen [sic] Fregeau." Clerk's Papers at 49. The court ordered a $60,815 equalization judgment for Mr. Long without disturbing the titling of property. Dr. Fregeau appealed. Ms. Fregeau successfully intervened on appeal.

ANALYSIS

A. Marriage did not Bar an Equity Relationship
¶ 12 The issue is whether the trial court erred in deciding Dr. Fregeau's marriage did not prevent the creation of an equity relationship.
¶ 13 We review a court's conclusions of law de novo. Gormley v. Robertson, 120 Wash.App. 31, 36, 83 P.3d 1042 (2004).
¶ 14 An equity relationship is a "stable, marital-like relationship where both parties cohabit with knowledge that a lawful marriage between them does not exist." Connell v. Francisco, 127 Wash.2d 339, 346, 898 P.2d 831 (1995) (citing In re Marriage of Lindsey, 101 Wash.2d 299, 304, 678 P.2d 328 (1984); Harry M. Cross, Community Property Law in Washington (Revised 1985), 61 WASH. L.REV. 13, 23 (1986)).
¶ 15 In Vasquez v. Hawthorne, 99 Wash. App. 363, 367, 994 P.2d 240 (2000) (Vasquez I), Division Two of this court partly reasoned an equity relationship is one where the parties can legally marry. On review, our Supreme Court, Vasquez v. Hawthorne, 145 Wash.2d 103, 107, 33 P.3d 735 (2001) (Vasquez II) held that the Vasquez I court erred on this point. The Vasquez II majority partly wrote, "Equitable claims are not dependent on the `legality' of the relationship between the parties, nor are they limited by the gender or sexual orientation of the parties." Vasquez II, 145 Wash.2d at 107, 33 P.3d 735. The Supreme Court reached the same conclusion in Olver, 161 Wash.2d at 668, 168 P.3d 348.
¶ 16 As noted in the next discussion, several factors are considered to determine the existence of an equity relationship. Connell, 127 Wash.2d at 346, 898 P.2d 831 (citing Lindsey, 101 Wash.2d at 304-05, 678 P.2d 328). No one factor is determinative. Thus, remaining married is a fact to consider, but it is not determinative. See In re Marriage of Pennington, 142 Wash.2d 592, 604, 14 P.3d 764 (2000) (parties married during part of relevant time). Considering these authorities, the trial court did not err in applying equity relationship law to this couple, even though Dr. Fregeau was married during part of his relationship with Mr. Long.

B. Equity Relationship Established
¶ 17 The issue is whether the trial court erred in considering relevant factors in deciding if an equity relationship existed here.
¶ 18 Relevant factors establishing an equity relationship include continuous cohabitation, relationship duration, relationship purpose, pooling of resources and services for joint projects, and the parties' intent. Connell, 127 Wash.2d at 346, 898 P.2d 831 (citing Lindsey, 101 Wash.2d at 304-05, 678 P.2d 328). These factors are neither exclusive nor hypertechnical but rather a means *30 to examine all relevant evidence. Pennington, 142 Wash.2d at 602, 14 P.3d 764. No factor is more important than another. Id.
¶ 19 Continuous Cohabitation: The trial court found, and the facts show, Dr. Fregeau moved into Mr. Long's residence in August of 1999 and, except for a three-month separation, they remained together until early February 2008. It weighed the instances of infidelity as insufficient to undermine its finding of continuous cohabitation. The court noted Dr. Fregeau's marriage, but considered it defunct. Ultimately, it found the approximate eight to nine-year cohabitation satisfied the continuous cohabitation requirements. We agree. The court's analysis is supported by the record.
¶ 20 Relationship Duration: The trial court found its analysis for the continuous cohabitation factor applicable to this factor as well. Dr. Fregeau contends this factor is not satisfied because the relationship was not exclusive since Mr. Long admitted to several instances of infidelity. Considering this record showing a seven to eight year relationship, the duration factor is satisfied because their relationship can be considered long enough to merit a property division much like a marriage of a similar length, despite a few months apart.
¶ 21 Relationship Purpose: The trial court found the parties provided mutual love, care, support, sex, friendship, and companionship. It found they intended to plan for retirement together and bought real estate with this purpose in mind. And, it found they essentially treated one another as though they were married and attempted counseling to maintain their relationship. Given the no-fault principles applied to marriage dissolutions and noting infidelities can occur during a marriage, Dr. Fregeau's reliance on Mr. Long's infidelities to argue against a shared purpose is unpersuasive. The court acknowledged that Mr. Long did not enter into a registered domestic partnership, that Dr. Fregeau was reticent toward the idea of children, and that the relationship was marked by infidelity. Given all in this record showing permanency planning, shared love and intimacy, extended family relationships, caring for one another when sick, and holding themselves out as a couple, the court did not err in determining the parties held a shared purpose in their relationship.
¶ 22 Pooling of Resources and Services for Joint Projects: The trial court correctly found this factor was satisfied. Significantly, it discussed the two houses that the pair purchased together. The pair attempted to jointly finance these properties but could not do so because of mortgage restrictions. The Wellesley house was titled to Mr. Long and he held the mortgage, but the pair managed it jointly. Similarly, the Havana house was titled to Dr. Fregeau and he held the mortgage, but both men financed the down-payment and initial renovations. And, while living in the Havana house together, they shared mortgage, utility, and other household expenses. The court found it significant that each party engaged in forbearance of rent and/or mortgage payments when necessary. The court noted their joint work on each other's rental properties and their work on the home of Mr. Long's mother. And, a joint account is not an essential factor in finding an equity relationship. Soltero v. Wimer, 128 Wash.App. 364, 115 P.3d 393 (2005).
¶ 23 Parties' Intent: The court decided the parties intended to be in a marriage-like relationship. Substantial evidence supports the court's reasoning. The trial court found Mr. Long and Dr. Fregeau discussed several times legally formalizing their relationship by moving to a jurisdiction recognizing their relationship and when Washington created the domestic partnership law. They attended a seminar on the subject. The court could discount Mr. Long's refusal to enter into a domestic partnership because that was suggested near the end of the relationship when the pair was attending counseling and in stress. Even so, they went to counseling to maintain their relationship. Dr. Fregeau did not intend to continue his marriage. Mr. Long remained in this relationship despite losing relationships with some of his family members.
¶ 24 In sum, the trial court did not err in abusing its discretion when finding the parties intended a marriage-like relationship and concluding an equity relationship existed.

*31 C. Retirement Accounts
¶ 25 The issue is whether the trial court erred in considering Dr. Fregeau's retirement accounts in its equitable property division.
¶ 26 We review the distribution of property at the end of an equity relationship for abuse of discretion. Koher v. Morgan, 93 Wash.App. 398, 401, 968 P.2d 920 (1998). Once the court finds an equity relationship, all property the parties acquired through their efforts during the relationship is before the court for distribution. In re Marriage of Lindemann, 92 Wash.App. 64, 69, 960 P.2d 966 (1998). The court must examine the relationship and property accumulation and make a just and equitable division of the property. Lindsey, 101 Wash.2d at 304, 678 P.2d 328. The court may characterize property as "separate" and "community" by analogy to marital property. Connell, 127 Wash.2d at 351, 898 P.2d 831; see RCW 26.16.010-.030 (definitions of separate and community property).
¶ 27 Unlike a marriage, at the end of an equity relationship, solely what would be community property is before the court. Connell, 127 Wash.2d at 351, 898 P.2d 831. The court may not dispose of the parties' separate property. Lindemann, 92 Wash.App. at 69, 960 P.2d 966. We presume any increase in value of separate property is likewise separate in nature. Lindemann, 92 Wash.App. at 69, 960 P.2d 966 (citing In re Marriage of Elam, 97 Wash.2d 811, 816, 650 P.2d 213 (1982)). However, "if the court is persuaded by direct and positive evidence that the increase in value of separate property is attributable to community labor or funds, the community may be equitably entitled to reimbursement for the contributions that caused the increase in value." Id. The labor of each party during a committed intimate relationship is community labor. Id. at 72, 960 P.2d 966.
¶ 28 Here, one of Dr. Fregeau's 401(k)s, the Rockwood plan, was established prior to the relationship as was Mr. Long's 401(k). Therefore, those two retirement accounts are separate property. Mr. Long testified he contributed to his 401(k) during the relationship, so the increase in value of that separate property was properly before the court as community-like property. However, Mr. Long did not present evidence that Dr. Fregeau contributed to the Rockwood plan during the relationship. Therefore, the increase in value of that plan was not properly before the court. Although the court did not actually award the funds from the Rockwood plan to Mr. Long, it did the functional equivalent by considering its increase in value during the relationship when determining an equalization payment. Therefore, the trial court abused its discretion in considering the increase in value of the Rockwood plan without direct and positive evidence of an increase in value attributable to community-like labor. On remand, the trial court should not consider the Rockwood plan in its property division order.

D. Ms. Fregeau is not a Necessary Party
¶ 29 The issue is whether the trial court erred in deciding the parties' interests in the Wellesley property without having joined Ms. Fregeau as a necessary party. Dr. Fregeau and Ms. Fregeau contend the court did not have jurisdiction over the Wellesley property because Ms. Fregeau, as a title owner, was not before the court.
¶ 30 The trial court lacks jurisdiction if all necessary parties are not joined. Treyz v. Pierce County, 118 Wash.App. 458, 462, 76 P.3d 292 (2003). A party is necessary if that party's absence "would prevent the trial court from affording complete relief to existing parties to the action or if the party's absence would either impair that party's interest or subject any existing party to inconsistent or multiple liability." Coastal Bldg. Corp. v. City of Seattle, 65 Wash.App. 1, 5, 828 P.2d 7 (1992); see CR 19(a). A title owner of a property is not a necessary party based solely on its status as a record owner. Gildon v. Simon Prop. Group, Inc., 158 Wash.2d 483, 145 P.3d 1196 (2006) (title owner of mall was not necessary party in injured plaintiff's premises liability action). Though Ms. Fregeau is a title owner of the Wellesley property, she was not a necessary party because nothing about the property division order impairs her interest in the property or *32 subjects her to conflicting liability. Title was not altered and she is not precluded from a future partition action. Therefore, the trial court did not err.
¶ 31 Affirmed. Remanded for further proceedings consistent with this opinion.
WE CONCUR: KORSMO, A.C.J., and SIDDOWAY, J.