# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In re:

AMANDA M. TURNER,

                Appellant,

        v.

JOSH L. DOWELL,

                Respondent.

DIVISION ONE

No. 84215-3-I

UNPUBLISHED OPINION

DWYER, J. — Amanda Turner appeals from the trial court's findings and final order on her petition for dissolution of a committed intimate relationship. The trial court concluded that Turner and Josh Dowell, who cohabited for approximately six years and have a child together, were not in a committed intimate relationship. Accordingly, the court held that Turner and Dowell did not create community-like property and that each shall retain their separate property and debts in their own names.

Turner asserts on appeal that the trial court erred in determining that she and Dowell were not in a committed intimate relationship and, thus, not applying equitable principles to divide the parties' property. We disagree. The trial court's factual findings, which are supported by substantial evidence in the record, demonstrate that Turner and Dowell were not in a committed intimate relationship. Although the length of the parties' relationship and the period of

cohabitation could support a contrary conclusion, the parties neither pooled resources for joint projects nor shared a mutual intent to establish such a relationship.  Accordingly, we affirm the trial court's findings and final order.

I

Amanda Turner and Josh Dowell met in late July 2011.  Turner was living in a rental townhouse in Sedro-Woolley with her 10-month-old son from a previous relationship.  She worked in sales at a Verizon Wireless retail store, which required that she work on weekends and holidays.  Her schedule made it difficult to find care for her son.  When Dowell met Turner, he was working as an electrician with the International Brotherhood of Electrical Workers, a job he had held his entire adult life.  At the time, Dowell lived in his home in Monroe on seven or eight acres of land, which he had purchased in 2003.  He also owned a rental home in Edmonds, as well as multiple pickup trucks and trailers, a backhoe, a tractor, two snowmobiles, and four or five ATVs.

By October or November 2011, Turner and Dowell had agreed to date each other exclusively.  Then, in April 2012, Turner disclosed to Dowell that she was pregnant.  The parties dispute whether the pregnancy was planned.  According to Turner, she and Dowell had agreed to have a child together.  Dowell testified, in contrast, that he was "in shock" to learn of the pregnancy, as they had never discussed having a child, and he did not want to have a child.[1]

Around this time, the parties began discussing living together and Turner

---

[1] Dowell also testified that he and Turner had discussed the removal of her intrauterine device (IUD), that he was aware that she had the IUD removed, and that he and Turner continued to have unprotected sex after removal of the birth control device.  Dowell was nevertheless clear that he did not want to have a child.

2

quit her sales job at Verizon. According to Turner, Dowell wanted her to quit the sales job due to the irregular hours. He purportedly told her that "you're going to be moving in with me," so "you don't need to make that much income." Dowell testified that he did not suggest to Turner that she quit her job, but that she chose to do so because her pay was being cut due to a new corporate pay structure and she wanted a more stable schedule for childcare purposes. Turner then took a job at Wells Fargo Bank, which, she testified, resulted in a "significant pay cut." She quit the Wells Fargo job in May 2012. Again, according to Turner, Dowell suggested that she quit her job at Wells Fargo and "just stay home."

The parties additionally dispute the tenor of their conversations regarding cohabitation. According to Dowell, Turner raised the issue of living together once she had become pregnant because "she was having trouble paying her bills" and was unsure "how everything could work out" with the baby coming. Dowell felt that "it was too soon in our relationship to live together, but it was kind of pushed with the baby and her expenses." He said that he "didn't know her very well at all" at that time. Turner testified, in contrast, that the idea to live together "was both of ours." In any event, Turner moved into Dowell's Monroe home "around June of 2012."[2]

Turner was a "stay-at-home" mom after she quit her job at Wells Fargo in May 2012. In January 2013, Turner and Dowell's daughter was born. Then, in September 2013, Turner went back to school, first at a technical college and then

---

[2] Turner testified that they began living together in June 2012, while Dowell testified that Turner moved into his home in September 2012. In an unchallenged finding of fact, the trial court found that Turner and Dowell began living together "around June of 2012."

3

at the University of Washington. She graduated in March 2017 with a Bachelor's degree in health studies. Turner paid for her education with student loans, grants, and scholarships, and she acquired approximately $40,000 in debt. Dowell was supportive of Turner returning to school so that she could get a good job.

During the period that Turner and Dowell cohabited, they never had joint savings or checking accounts and Turner did not contribute toward the mortgage or utilities for the home. Turner testified that she and Dowell shared some accounts, including a cell phone account, eBay account, PayPal account, and Costco membership. She further testified that she contributed financially toward daycare, grocery, and household expenses. During this time, Turner and Dowell took vacations together, spent time together with family and friends, and celebrated holidays together. Dowell acted as a stepfather for Turner's son.

In addition, during their cohabitation, Turner and Dowell acquired a membership at Gold Bar Nature Trails, which he purchased but put in both of their names. They raised a litter of eleven Mastiff puppies to sell, though with the related expenses, including repairs to the home due to damage, they did not make a profit. In 2016, Dowell purchased a home in Brier for use as another rental property. He paid for the property by taking a loan out from his retirement plan and using his Edmonds property as collateral. While Turner testified that she "pick[ed] out everything" for the Brier home, Dowell stated that Turner had neither contributed financially nor performed any work on the property.

The record demonstrates that the parties' relationship was tumultuous

4

throughout.  They discussed separating and her moving out of the home on multiple occasions, beginning in 2014 or 2015.  Turner was struggling with alcohol use and gambling.  According to Dowell, he consciously refrained from sharing finances with Turner due to those struggles.  He testified that Turner's drinking contributed to the demise of the relationship.  Dowell paid for Turner to participate in rehabilitation programs toward the end of their relationship so that Turner could "get better" and "hopefully come back and be a mom" and share custody of their daughter.

Throughout the relationship, Dowell repeatedly stated that he did not want to get married or to "be in a long-term relationship thing."  According to Turner, Dowell expressed that he was uninterested in marriage because he had friends who had been "taken advantage of" financially in their marriages.  In 2016, following arguments between the parties, Turner began researching the law regarding committed intimate relationships.  During a subsequent argument in which Dowell suggested that Turner move out, Turner raised the issue of a committed intimate relationship.  Then, in early 2018, Dowell presented to Turner a "non-CIR" cohabitation agreement stating that the parties were "roommates," which Turner refused to sign.  Turner moved out of Dowell's residence in the summer of 2018.

In November 2018, Dowell served Turner with a petition for parenting plan and child support.  Two days later, Turner commenced this action by filing a petition for dissolution of a committed intimate relationship.  Following Dowell's response to the petition, no further action was taken in this matter until early

5

2022, when Turner filed a trial brief seeking the division of property acquired in Dowell's name during their relationship. Dowell opposed the petition, denying that he and Turner had been in a committed intimate relationship.

The trial court heard four days of testimony between March 30, 2022 and April 4, 2022. On April 27, 2022, the court issued an oral ruling in which it determined that Turner and Dowell had been in a committed intimate relationship. However, the court ruled that, considering "the equities," "the appropriate way is to end this with each party taking what they had."

The trial court entered its written order on May 27, 2022. In the written order, the court found that Turner and Dowell cohabited in Dowell's separate property residence from around June 2012 through the summer of 2018, and that they were in a relationship for "over seven years." The court found that, during that time, the parties "loved each other and they cared for each other" and that they "had a child together and raised that child together," but that Dowell made a "purposeful decision" to not ask Turner to marry him. The court further found that "[a]fter years of concerns about [Turner's] alcohol use, [Dowell] did not wish to continue the relationship." The court determined that the parties intentionally "did not pool resources for projects," "did not share bank accounts," and "did not purchase [vehicles] jointly."

The trial court additionally found that Turner lived in Dowell's home "rent and nearly expense free while she took advantage of the opportunity to advance her education and get a degree," and that Dowell paid for "virtually all of the monthly expenses" without contribution from Turner. The court determined that

6

the Brier property was purchased with funding acquired through Dowell's retirement account. The court found that, when Turner "announced she had done research and wanted a [committed intimate relationship] in 2017, [Dowell] had a specific contract drafted laying out his desire not to be in [such a relationship] and presented it to [Turner]."

Contrary to its earlier oral ruling, the court concluded in its written order that the parties were *not* in a committed intimate relationship. Nevertheless, the court ruled that, even if the parties had been in such a relationship, "the result of the property division would be the same," as "[i]t would be inequitable to order the parties to divide their assets in a fashion different than they did intentionally during the relationship." Thus, the trial court ordered that "[e]ach party shall retain the property currently in their own names and the debts currently in their own names."

Turner appeals.

II

Turner challenges numerous of the trial court's factual findings and asserts that the court erred by concluding that she and Dowell were not in a committed intimate relationship. She contends that, because the parties were in such a relationship, the trial court was required to distribute the parties' property in accordance with equitable principles similar to those applicable to marriage dissolution proceedings. We disagree.

Cognizant of the deference owed to the fact finder in evaluating the persuasiveness of evidence and witness credibility, we conclude that the

7

challenged factual findings are supported by substantial evidence in the record. Those findings support the trial court's conclusion that the relationship between Turner and Dowell did not constitute a committed intimate relationship. Because no such relationship existed, the trial court was not authorized to apply equitable principles to distribute the parties' property. The trial court thus properly ordered that each party retain the property and debts in their own names.

A

Whether a committed intimate relationship exists is a mixed question of law and fact. In re Pennington, 142 Wn.2d 592, 602, 14 P.3d 764 (2000). "[T]he trial court's factual findings are entitled to deference, but the legal conclusions flowing from those findings are reviewed de novo." Pennington, 142 Wn.2d at 602-03. We review challenged factual findings for substantial evidence. In re Marriage of McDole, 122 Wn.2d 604, 610, 859 P.2d 1239 (1993). Substantial evidence is evidence sufficient to persuade a rational, fair-minded person that the finding is true. In re Relationship of Muridan & Redl, 3 Wn. App. 2d 44, 55, 413 P.3d 1072 (2018). "In evaluating the persuasiveness of the evidence and the credibility of witnesses, we must defer to the trier of fact." In re Marriage of Akon, 160 Wn. App. 48, 57, 248 P.3d 94 (2011).

A committed intimate relationship "is a stable, marital-like relationship where both parties cohabit with knowledge that a lawful marriage between them does not exist." Connell v. Francisco, 127 Wn.2d 339, 346, 898 P.2d 831 (1995). "The [committed intimate relationship] doctrine is a judicially created doctrine used to resolve the property distribution issues that arise when unmarried people

8

separate after living in a marital-like relationship and acquiring what would have been community property had they been married." In re Kelly & Moesslang, 170 Wn. App. 722, 732, 287 P.3d 12 (2012). It operates to protect "the interests of unmarried parties who acquire property during their relationship by preventing the unjust enrichment of one at the expense of the other when the relationship ends." Muridan, 3 Wn. App. 2d at 55.

Relevant factors establishing a committed intimate relationship include "continuous cohabitation, duration of the relationship, purpose of the relationship, pooling of resources and services for joint projects, and the intent of the parties." Connell, 127 Wn.2d at 346. These factors "are neither exclusive nor hypertechnical. Rather, these factors are meant to reach all relevant evidence helpful in establishing whether a [committed intimate relationship] exists." Pennington, 142 Wn.2d at 602.[3] Whether a committed intimate relationship exists "depends upon the facts of each case." Pennington, 142 Wn.2d at 602.

If the trial court determines that a committed intimate relationship existed, "the court may equitably divide the property acquired during the relationship in a manner similar to marriage dissolution proceedings." In re Relationship of Amburgey & Volk, 8 Wn. App. 2d 779, 787, 440 P.3d 1069 (2019). However, the application of the analogy between marriage and a committed intimate relationship for property distribution purposes can be made only after the

_____

[3] Much of the decisional authority refers to such relationships as "meretricious." However, "[o]ur Supreme Court has noted 'meretricious' carries negative and derogatory connotations and has chosen to substitute 'committed intimate relationship' for meretricious relationship." In re Relationship of Long & Fregeau, 158 Wn. App. 919, 922, 244 P.3d 26 (2010).

9

existence of such a relationship has been established.[4]  Amburgey, 8 Wn. App. 2d at 788.  "It is inappropriate to ascribe common law, marriage-related property rights to those who have not timely proved that there is a [committed intimate relationship] in the first place."  Kelly, 170 Wn. App. at 737.

B

Here, the trial court made factual findings relating to each of the factors pertinent to determining whether a committed intimate relationship existed. Based on these findings, the court concluded that Turner and Dowell were not in such a relationship.  Turner challenges multiple findings of fact made by the trial court.  We conclude that these factual findings are supported by substantial evidence in the record.  Because the trial court's conclusion—that Turner and Dowell were not in a committed intimate relationship—flows from the supported findings, Turner's claim of error is without merit.

### 1.  Continuous cohabitation

The trial court found that Turner and Dowell cohabited from the time Turner moved into Dowell's Monroe home "around June of 2012" until the summer of 2018, for a period of about six years.  Turner testified that she moved into Dowell's home in June 2012 and that the relationship was "done" in July 2018.  Dowell similarly testified that Turner moved out in July 2018 when she sought treatment for alcohol abuse.  Thus, substantial evidence supports the trial

---

[4] Thus, the "three-prong analysis" for property distribution following the termination of a committed intimate relationship is as follows: "First, the trial court must determine whether a [committed intimate] relationship exists.  Second, if such a relationship exists, the trial court evaluates the interest each party has in the property acquired during the relationship.  Third, the trial court then makes a just and equitable distribution of such property."  Pennington, 142 Wn.2d at 602.

court's finding that the parties cohabited for approximately six years.[5]  This court has held that cohabitation for approximately six years constitutes a "'stable cohabiting relationship'" favoring a determination that a committed intimate relationship existed.  Muridan, 3 Wn. App. 2d at 58 (quoting Pennington, 142 Wn.2d at 603).  Similarly, here, we conclude that the parties' period of cohabitation tends to demonstrate the existence of a committed intimate relationship.

## 2.  Duration of the relationship

The trial court additionally found that Turner and Dowell were in a relationship for over seven years, "although they did not live together for that entire period of time."  In Muridan, this court held that "the duration factor favors that a [committed intimate relationship] existed" when the parties had been "together for approximately seven years."  3 Wn. App. 2d at 59.  Thus, as with the period of cohabitation, the duration of Turner and Dowell's relationship tends to show that the parties were in a committed intimate relationship.

Nevertheless, the fact that consideration of these two factors favors such a conclusion is not dispositive of whether a committed intimate relationship

---

[5] Turner challenges the trial court's finding regarding the parties' period of cohabitation. Specifically, Turner takes issue with the court's statement that she "*stayed* [at the Monroe home] most of the time" during the period from June 2012 through the summer of 2018.  (Emphasis added.)  According to Turner, the trial court should have found that she "lived" in the home during that time, not that she "stayed" there.

The record indicates, however, that the trial court was not suggesting that Turner did not "live" in the home during that time.  Instead, the court appears to have been considering whether the period of cohabitation was continuous.  Turner testified that she did not spend extended periods of time out of the house and could "count on . . . both hands" the number of nights she and Dowell did not spend together.  Substantial evidence supports the trial court's finding regarding the period of cohabitation, and the court's use of the word "stayed," rather than Turner's preferred term "lived," does not undermine that finding.

existed. For instance, in <u>Pennington</u>, our Supreme Court held that a relationship that, "while not continuous, spanned 12 years," satisfied the duration requirement for evaluating whether the parties' had been in a committed intimate relationship. 142 Wn.2d at 604. However, the court ultimately concluded that other factors did not justify the equitable division of property acquired by the parties during their relationship. <u>Pennington</u>, 142 Wn.2d at 605. "[A] long-term relationship alone," the court held, "does not require the equitable division of property." <u>Pennington</u>, 142 Wn.2d at 604. Thus, although the duration of Turner's and Dowell's relationship favors a finding that the parties were in a committed intimate relationship, no factor alone is itself determinative.

### 3. <u>Purpose of the relationship</u>

In evaluating the purpose of the relationship, Washington courts have considered whether the parties provided to one another "companionship, friendship, love, sex, and mutual support and caring." <u>Pennington</u>, 142 Wn.2d at 605. <u>See also</u> <u>Muridan</u>, 3 Wn. App. 2d at 59 (trial court "found that the purpose of the parties' relationship was companionship, support, and to create a family"); <u>In re Relationship of Long & Fregeau</u>, 158 Wn. App. 919, 927, 244 P.3d 26 (2010) (trial court found that the parties provided "mutual love, care, support, sex, friendship, and companionship," and "treated one another as though they were married").

Here, the trial court found that Turner and Dowell "loved each other and they cared for each other" and "had a child together and raised that child together." The court did not, however, make further findings regarding whether a

12

committed intimate relationship existed based on the purpose of the parties'

relationship. While Turner suggested that the purpose of the relationship was to

"raise our family together and be a family," Dowell's testimony refuted that

rendering. Dowell testified that, even after their child was born, the purpose of

the relationship was "dating." Although, he explained, they became a family

because of their child, Dowell testified that he and Turner "were just two different

people on two different paths. We never blended together as a couple, so we

weren't on the same page. We were very much just separate. Our only bond

was that we had a child." Neither the trial court's findings nor the record

indicates that a committed intimate relationship existed based on this factor.

### 4. Pooling of resources and services for joint projects

The trial court made several findings indicating that the parties

intentionally refrained from pooling their resources during their relationship. For

instance, the court found, contrary to Turner's testimony, that Turner did not give

up a lucrative career for the purpose of caring for the parties' child. Rather, the

court found, Turner did so because daycare costs, both for her son from a

previous relationship and for the parties' daughter, "would have subsumed her

income."[6] The trial court additionally found that the parties intentionally "did not

pool resources for projects and did not share bank accounts," and that the Gold

Bar Nature Trails camping membership, though jointly owned by the parties,

---

[6] This finding of fact, challenged by Turner on appeal, is supported by Dowell's testimony that Turner quit her job at Verizon because the company changed its pay structure in a manner that would have resulted in less remuneration for Turner. The trial court clearly credited Dowell's testimony on this issue. We defer to the trial court's credibility assessments. Akon, 160 Wn. App. at 57. Substantial evidence supports the trial court's finding.

"was paid for by Mr. Dowell."[7]  The court further found that the parties
intentionally refrained from jointly purchasing vehicles.[8]  The trial court found that
Turner benefited from living in Dowell's home "rent and nearly expense free"
while she pursued her education and that "virtually all of the monthly expenses
were paid for by Mr. Dowell without any assistance or contribution from Ms.
Turner."[9]  The Brier home, the court found, was purchased with funding acquired
through Dowell's retirement account and was solely his project.[10]  Thus,
numerous findings by the trial court, each supported by substantial evidence in
the record, demonstrate that the parties did not pool their resources and services
to contribute to joint projects.

The sole finding by the trial court regarding Turner's household
contributions states that Turner "did contribute to the Verizon bill, waste
management bill, and a PayPal and eBay account, although typically she sought
reimbursement for those expenses from [Dowell]."  Evidence that the parties
shared some living expenses is "not sufficient to show a significant pooling of

---

[7] These challenged findings are supported by substantial evidence.  Dowell testified that
he always paid the mortgage payment, that they never shared bank accounts, that they never
discussed pooling resources for any projects, and that Turner did not contribute resources to any
of his projects.  Dowell further testified that he purchased the Gold Bar Nature Trails membership,
despite that it was in both parties' names.  The trial court clearly credited this testimony, and we
defer to such credibility assessments.  Akon, 160 Wn. App. at 57.

[8] This finding of fact, challenged by Turner on appeal, is supported by Dowell's testimony
that he sold previously owned vehicles in order to purchase the vehicles he acquired during their
relationship.

[9] Again, this finding, challenged by Turner on appeal, is supported by substantial
evidence, including Turner's testimony that she never paid rent or mortgage payments and
Dowell's testimony that Turner paid no household bills other than the waste management bill.

[10] These findings are supported by substantial evidence—namely, Dowell's testimony,
which was clearly credited by the trial court, that he paid for the Brier property by taking out a loan
from his retirement plan and using his Edmonds property as collateral and that Turner neither
contributed financially nor performed any work on the Brier property.  Turner similarly testified that
Dowell paid the down payment for the Brier home by taking a loan out of his pension.

resources and services for joint projects." Pennington, 142 Wn.2d at 604.

Compare Long, 158 Wn. App. at 927-28 (finding that this factor was satisfied when the parties purchased two houses together, shared the mortgage and other household expenses, and jointly worked on one another's rental properties). Indeed, such household expenses are simply the expenses of daily living, and thus do not demonstrate a pooling of resources that could be distributed when a relationship terminates. The record demonstrates no attempt by the parties to jointly acquire community-like assets.

Turner nevertheless asserts that the parties were "necessarily required" to "pool their collective time, money, and energy" to accomplish the goals of "raising children and advancing each other's careers."[11] She contends that sharing the responsibilities for raising two children "is the very definition of pooling the time and energy."[12] Certainly, nonmonetary contributions to a relationship can inform whether the parties pooled resources and services in determining whether a committed intimate relationship existed. Here, however, neither the trial court's findings of fact nor the parties' testimony indicates that such pooling of resources occurred. Turner cites to no authority holding that the existence of a cohabiting relationship in which the parties raise children leads inexorably to the conclusion that the parties pooled resources and services for joint projects. We do not so hold here. Rather, the trial court's findings of fact, which are supported by substantial evidence in the record, indicate that the parties did not jointly

---

[11] Reply Br. of Appellant at 9.
[12] Reply Br. of Appellant at 11.

contribute their time, effort, or financial resources in a manner that justifies the equitable division of property.[13]

## 5. Intent of the parties

When determining the intent of the parties, Washington courts consider whether the parties intended to live together as a family and to be in a marriage-like relationship. Muridan, 3 Wn. App. 2d at 60; Long, 158 Wn. App. at 928. The parties' intent suggests a forward-looking analysis in which the court considers evidence of the parties' long-term plans. Here, Turner testified that their intention was to "continue to be significant others and raise our family together and be a family." She acknowledged, however, that Dowell consistently delayed the question of marriage. Dowell testified, in contrast, that the purpose of their relationship was "dating," even after their child was born. According to Dowell, he and Turner were just getting to know each other when Turner became pregnant and moved in, and living together was "kind of pushed with the baby and [Turner's] expenses." He described the relationship as "extremely toxic," and testified that he had made clear that he did not want a marriage or long-term relationship.

Crediting Dowell's testimony, the trial court found that Dowell had been clear that he did not want to marry Turner, and that Turner remained in the

_____

[13] Turner additionally challenges the trial court's finding that the parties did "very few things" jointly. This finding is supported by Dowell's testimony on which the trial court relied in making its other findings of fact regarding the pooling of resources. Turner also challenges the finding that "there was no net profit" when the parties bred Mastiff puppies. This finding is supported by Dowell's testimony that the profit from selling the puppies "went back into the dogs," including for veterinary care, food and other related expenses, and repairs after the dogs "demolished the house."

relationship knowing that Dowell did not intend to marry her.[14]  The court further found that "[a]fter years of concern about Ms. Turner's alcohol use, Mr. Dowell did not wish to continue with the relationship."[15]  In an unchallenged finding of fact, the trial court found that when Turner "announced she had done research and wanted a [committed intimate relationship] in 2017, [Dowell] had a specific contract drafted laying out his desire not to be in a [committed intimate relationship] and presented it to [Turner]."

The trial court credited Dowell's testimony that he did not intend to have a marriage-like relationship with Turner.  We defer to such credibility determinations.  Akon, 160 Wn. App. at 57.  Although Turner may have intended to form such a relationship, it is the parties' mutual intent that determines whether a committed intimate relationship existed.  The record supports the trial court's determination that no such mutual intent was present here.

C

Whether a relationship is properly characterized as a committed intimate relationship depends on the facts of each case.  Pennington, 142 Wn.2d at 602.  The factors set forth in Connell, 127 Wn.2d at 346, are not applied in a "hypertechnical fashion," Muridan, 3 Wn. App. 2d at 55, and no one factor is

---

[14] Turner challenges on appeal the portion of the trial court's finding stating that "[i]n 2014, during marriage counseling, Mr. Dowell said [that] he didn't want to be married."  This finding is supported by Dowell's testimony, in which he stated: "I made it really clear I didn't want to get married, and I didn't want to be in a long-term relationship thing, and so we went to counseling to even discuss that in 2014."

[15] Turner challenges this finding of fact.  Dowell testified extensively, however, regarding the effect of Turner's use of alcohol on the relationship, which, he asserted, led to the relationship's "demise."  Turner herself testified that her use of alcohol was "a portion of" the problem.  This court defers to the trial court's credibility assessments.  Akon, 160 Wn. App. at 57.  Substantial evidence supports the trial court's finding.

dispositive.  See Pennington, 142 Wn.2d at 604 (holding that "a long-term relationship alone does not require the equitable division of property"; rather, "[o]ther factors must also justify the need" for such property division).

Here, the period of continuous cohabitation and the duration of Turner's and Dowell's relationship marginally favor a determination that a committed intimate relationship existed.  See, e.g., Muridan, 3 Wn. App. 2d at 58-59 (cohabitation for six years and relationship duration of seven years); Long, 158 Wn. App. at 926-27 (seven- to eight-year relationship with continuous cohabitation).  These factors alone, however, are not dispositive, and the other pertinent factors strongly support the trial court's conclusion that Turner's and Dowell's relationship was not a committed intimate relationship justifying the equitable division of property acquired during the relationship.  As the trial court found, Turner and Dowell intentionally avoided pooling their resources for projects, sharing bank accounts, or purchasing property jointly.  This absence of the pooling of resources undermines the conclusion that the parties had a committed intimate relationship justifying the equitable division of property.  Pennington, 142 Wn.2d at 607 (concluding that no committed intimate relationship existed when the parties "maintained separate [bank] accounts, purchased no significant assets together, and did not significantly or substantially pool their time and effort to justify the equitable division of property acquired during the course of their relationship").

Moreover, there is no evidence in the record suggesting a mutual intent to form a marriage-like relationship.  Rather, the record demonstrates that Dowell

had no such intent. Thus, although the parties' continuous cohabitation and the duration of their relationship could indicate that a committed intimate relationship existed, the evidence demonstrates neither that the parties pooled their resources for joint projects nor that they shared a mutual intent to form such a relationship. Accordingly, the trial court did not err by concluding that the parties were not in a committed intimate relationship.

Only after the existence of a committed intimate relationship is established does the trial court have the authority to "equitably divide the property acquired during the relationship in a manner similar to marriage dissolution proceedings." Amburgey, 8 Wn. App. 2d at 787. Turner acknowledges that, because the trial court concluded in its written findings and order that the parties were not in a committed intimate relationship, the issue of property distribution "was not before the court."[16] She nevertheless asserts that the trial court's prior oral ruling, in which the court stated that the parties *were* in such a relationship, was the correct ruling, and thus that the court was required to equitably divide the property acquired by the parties during their relationship. We disagree.

"[A] trial judge's oral decision is no more than a verbal expression of [her] informal opinion at the time. It is necessarily subject to further study and consideration, and may be altered, modified, or completely abandoned." Ferree v. Doric Co., 62 Wn.2d 561, 566-67, 383 P.2d 900 (1963). The court's oral ruling "has no final or binding effect, unless formally incorporated into the findings, conclusions, and judgment." Ferree, 62 Wn.2d at 567; see also Lang Pham v.

---

[16] Br. of Appellant at 70.

Corbett, 187 Wn. App. 816, 830-31, 351 P.3d 214 (2015) ("A written order controls over any apparent inconsistency with the court's earlier oral ruling."). Thus, Turner's assertion that, premised on the trial court's oral ruling, the court should have applied equitable principles to divide the property acquired by the parties during their relationship is without merit.

The trial court's factual findings regarding the factors set forth in Connell, 127 Wn.2d at 346, are supported by substantial evidence in the record. Those findings demonstrate that Turner and Dowell were not in a committed intimate relationship that would justify the equitable division of property acquired during their relationship. Accordingly, the trial court did not err by ordering that the parties shall retain the property and debts currently in their own names.

Affirmed.[17]

_Duyn, J._

---

[17] Turner requests that, in the event remand is necessary, we order that the matter be heard by a different trial judge. Because we affirm the trial court's findings and final order, remand is not necessary. However, we note that, even were we to remand to the trial court, Turner's assertion that the trial judge was impartial is without merit.

Turner additionally requests an award of attorney fees on appeal pursuant to RCW 26.09.140. We have previously held that this statute, which pertains to marriage dissolution proceedings, does not authorize an award of fees in proceedings regarding committed intimate relationships. In re Parentage of G.W.-F., 170 Wn. App. 631, 649, 285 P.3d 208 (2012); see also Foster v. Thilges, 61 Wn. App. 880, 887, 812 P.2d 523 (1991). Accordingly, we deny Turner's request for a fee award on appeal.

WE CONCUR:

Díaz, J.

Birk, J.