IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Committed Intimate Relationship of<br><br>BRICK EARL HARRIS,<br><br>                Respondent,<br><br>and<br><br>ROBERT HOBSON BRIMLOW,<br><br>                Appellant. | No. 84501-2-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

BOWMAN, J. — Brick Harris and Robert Brimlow lived together for 16 years. In that time, they held themselves out as a couple, shared resources, and bought two houses together. When they separated, Harris petitioned for a division of assets, alleging a committed intimate relationship (CIR). Brimlow opposed the petition, arguing he and Harris were only housemates and business partners. Following a bench trial, the court ruled for Harris. It then awarded Harris one house and Brimlow the other. Brimlow appeals. Because the record supports the trial court's conclusions and it did not abuse its discretion in dividing property, we affirm.

FACTS

Harris and Brimlow met at a mutual friend's birthday party in January 2003. At that time, Harris worked at Home Depot and owned a home in Everett.

Brimlow was a flight attendant for United Airlines and renting an apartment in SeaTac. Brimlow also owned investment properties in Burien, Tacoma, and Seattle's Columbia City neighborhood.

After the birthday party, Harris and Brimlow exchanged numbers and got to know each other by phone. They went on dates, and about eight or nine months into the relationship, they had sex. After having sex once, the two concluded they were not "compatible sexually," and seldom expressed their affection to one another physically. Still, within six months, Brimlow gave Harris a key to his home, where they spent nearly every night in the same bed together. In those early years, Brimlow often read Harris to sleep.

During their time together, Harris and Brimlow enjoyed seeing movies, going out to restaurants, and attending music concerts, theatre performances, and Cirque du Soleil shows. They also enjoyed travelling together. Harris estimated that over the course of their relationship, they took at least 30 to 35 vacations. And the couple shared an interest in construction and renovation. Between 2003 and 2005, they worked on renovations on all three of Brimlow's rental properties.

In summer 2005, Harris and Brimlow bought a home from a friend's grandmother—a "tiny fixer-upper" in Green Lake. The couple wanted to renovate, and they thought it would be a good opportunity to earn equity for retirement. To afford the house, Brimlow told Harris they could qualify for an interest-only loan, but Harris' income could not support their mortgage application. Brimlow said the bank would only finance the purchase if they listed

Harris as a renter to show the property had income. But the parties agreed that they would refinance into a conventional mortgage when they could qualify and own the home jointly. So, at first, the mortgage, deed, and title to the Green Lake house named only Brimlow. And the parties executed a joint venture agreement (JVA), which showed the bank that Harris was a renter, but also allocated Harris a financial interest in the house.

After purchasing the Green Lake property, Harris and Brimlow moved into the house together. They agreed to sleep in different bedrooms because they "both slept better when [they] slept alone," so Harris set up his bedroom in the basement "because it was cool down there." Harris then sold his Everett property in 2006. And in 2007, Harris and Brimlow bought another house in Burien to renovate and rent.[1] Harris believed both men were on the title to the Burien house. They shared a joint bank account for projects on their houses, a Costco card, and the same homeowner's and car insurance.

In 2011, the parties refinanced the Green Lake house, putting both Harris and Brimlow on the deed and title. After refinancing, Harris tore up the JVA in front of Brimlow. Harris and Brimlow also added each other as domestic partners to their employers' medical and dental coverage. And in 2012, when marriage became available to same-sex couples in Washington, Harris bought rings for him and Brimlow to wear. Harris also added Brimlow to his will and granted him

---

[1] This is a different property than the rental property in Burien that Brimlow owned before meeting Harris. Brimlow eventually sold his rental properties in Burien and Columbia City. Brimlow's Tacoma property was not at issue in the CIR proceedings.

a limited power of attorney, including health care decisions. Throughout the years, the couple gave each other Valentine's day cards and sent joint Christmas cards to their neighbor.

Around 2019, Harris started feeling unhappy with the relationship. Over the next couple of years, he realized it was ending. In early 2021, Harris consulted a family law attorney because Brimlow kept requesting that he sign a quitclaim deed relinquishing his rights to the Burien house. Then, in March 2021, he found Brimlow having sex with Harris' coworker in their home. Harris described this as "the final straw" and, soon after, moved out of the Green Lake house. Harris then petitioned the court for a distribution of property, alleging he and Brimlow were in a CIR. Brimlow opposed the petition, arguing that their relationship was solely roommates and business partners.

The case went to bench trial in July 2022. At trial, Harris testified to the above facts and entered into evidence photos of him and Brimlow on several vacations. He submitted images of joint Christmas cards they sent a neighbor that each of them signed. One card showed a picture of them together. Harris testified that between 2005 and 2016, they exchanged Valentine's day cards. He entered some of those cards into evidence. Several cards were signed "Love, Rob" in Brimlow's handwriting. Harris testified that in their relationship, "[w]e treated each other like we were married. We were best friends. We were boyfriends. We were business partners. To me it was just like a normal relationship."

Harris called as witnesses Conlyn MacInnis, Challie Brooks, Renee Higbee, and Gloria Grimm, who all testified about the nature of his and Brimlow's relationship.  MacInnis, a work friend of Harris', testified that Harris and Brimlow "acted like any couple would."  She testified that they were "not overly affectionate," but they would hold each other and say "kind words to one another."  Based on her observations, MacInnis "just knew that they were in a relationship."  Brooks, a neighbor of the Green Lake house, testified that she "always thought [Harris and Brimlow] were a couple" because they always did things together.  She testified that they "arrived to block parties together," made plans together, vacationed together, and sat next to each other at dinner parties like couples do.  Higbee, a former coworker of Harris and longtime friend, testified that she observed Harris and Brimlow "[h]ugging and kissing, . . . the normal stuff . . . couples do."  And Grimm, a longtime friend of both Harris and Brimlow, testified that she believed they were a "couple" based on "their body language and the way they acted around each other."  She said they were "affectionate" toward each other.

Harris also called as a witness Joseph Hasson, a real estate appraiser, who valued the Green Lake house at $825,000.  Hasson did not value the Burien house.  Harris asked the court to award him the Green Lake house, award Brimlow the Burien house, and equally divide their retirement accounts.

Brimlow testified that he and Harris were only friends and business partners.  He said that early in their interactions, Harris wanted to pursue a romantic relationship with him, which he rebuffed.  According to Brimlow, Harris

5

"was definitely very committed to a relationship," and "it made him feel really bad when I turned him down." Brimlow testified that their interactions were difficult after that because Harris' "ardor had not seemed to cool much," and that he rejected Harris' advances twice more before 2005 when they bought the Green Lake house.

Brimlow testified he intended to buy the Green Lake house alone, but he was worried he could not afford it. So, he asked Harris if he would like to rent a room in the house, help with renovations, and receive a proportional ownership interest in the house based on his contributions. Harris agreed, and they both moved into the house. Brimlow testified that he lived upstairs, Harris lived in the basement, and they shared the kitchen and living room.

Brimlow said that shortly after they moved into the Green Lake house, he and Harris executed the JVA to establish their rights and interests in the home.[2] The JVA, titled "Month-to-Month Tenancy and Joint Venture Agreement," granted Harris a "non-exclusive right to possession and the non-exclusive right to reside with [Brimlow]" at the Green Lake house month-to-month. Harris' rent was set at half the monthly mortgage cost. It said that the parties agreed to jointly remodel and improve the residence. And the JVA created a structure for how the parties would divide proceeds from an eventual sale of the property; essentially, repaying costs of the project, reimbursing the parties for their contributions to the project, and allocating any remaining funds proportionally based on each party's

---

[2] The court reserved ruling on admission of the JVA at trial but admitted it into evidence in its "Addendum to Preliminary Findings and Conclusions about a Committed Intimate Relationship" (Addendum).

6

contribution of labor and costs. The JVA required the parties to create and contribute to a joint construction account. And it required Brimlow to provide Harris an annual accounting of the parties' contributions and prospective proceeds. Brimlow testified that consistent with the JVA, he opened a joint account, Harris deposited money in the account for rent and utilities, and Brimlow used those funds to pay the mortgage.

Brimlow testified that when interest rates dropped in 2011, he sought to refinance the Green Lake house. But he could not afford to do so alone, so he and Harris jointly refinanced, adding Harris to the title. Still, Brimlow said he continued to view Harris as his renter.

As to their Burien house, Brimlow said he bought it in 2006 on an interest-only mortgage that he intended to refinance later. Harris expressed an interest in investing in the house, too, so they orally agreed that the JVA would apply equally to the Green Lake and Burien houses. Then, in 2011, he refinanced with Harris' help and executed a quitclaim deed listing them both on the Burien property. But Brimlow said Harris was listed only to refinance at a lower rate, not to grant him an equal interest in the property.

Brimlow testified that he and Harris maintained separate accounts for all purposes except for the joint construction account required under the JVA. Brimlow admitted that they shared auto, umbrella, and liability insurance and that he put Harris on his medical insurance as a domestic partner. But he claimed that he did so only as a friend.

Brimlow steadfastly denied that he and Harris had a romantic relationship other than a one-time sexual encounter. He said after 2005, Harris continued to pursue him, and he always rejected Harris' advances. He said he had to repeatedly tell Harris to stop telling other people that they were a couple, but he ultimately "just gave up" because "[i]t was just too much work." Brimlow testified that between 2003 and 2021, he had "a couple of dozen" sexual partners. He did not tell Harris about those partners because it was "none of his business."

When asked about the cards, rings, and vacations, Brimlow testified that he and Harris sent the neighbor Christmas cards because the three of them had a good relationship. And he testified that he gave Harris Valentine's day cards because living with Harris was difficult, and giving cards "placate[ed]" him. He said that he signed lots of cards to his friends "Love, Rob" and that it was "just a platonic love." Brimlow testified that he vaguely remembered Harris purchasing him a ring, but he never wore it. And he admitted that he often travelled with Harris but explained that he "travelled with people frequently."

Finally, Brimlow offered testimony from several friends about the nature of his and Harris' relationship. Christian Caicedo, a romantic partner who lives in Spain that Brimlow met while traveling, testified that he believed Brimlow and Harris were friends and housemates based on Brimlow's representation that he did not have another intimate partner. Sandra Thurnau, a neighbor, testified that she believed Brimlow and Harris "were business partners, and [Harris] was renting the basement from [Brimlow]," because she and Brimlow spoke about their contractual arrangement several times. Janice Bridges, a longtime friend of

8

Brimlow's, testified that she did not believe they were a couple because Brimlow said they were just "roommates." Craig Koball, a coworker of Harris' and romantic partner of Brimlow's, testified that he did not believe Brimlow and Harris were in a romantic relationship because Brimlow insisted they were just "housemates." And George Banton, a longtime friend of both Brimlow and Harris, testified that he once asked Brimlow about the relationship, and Brimlow said that he and Harris were business partners. Banton also said that he did not believe they had a romantic relationship because when Harris introduced Brimlow as his "partner," Brimlow would clarify that they were partners "[i]n business only." Finally, Brimlow's financial planner, a longtime colleague, and his real estate agent each testified that Brimlow told them that he and Harris were business partners and housemates and not romantically involved.

After trial, the court weighed the competing testimony and found Harris' version of events more credible. The court explained that Harris "testified in a straightforward, calm, and forthright manner" and that his "claims about his relationship with [Brimlow] were reasonable in the context of the other evidence." The court also found Harris' witnesses credible. Accordingly, in its findings of fact and conclusions of law, the court found:

> (a) [T]he parties continually cohabitated for nearly 16 years; (b) the relationship existed for nearly another two years prior to that, for a total of 18 years; (c) the purpose of the relationship was primarily a romantic one, though they had business interests together; (d) the parties pooled their resources and services for the many joint projects they engaged in; and (e) the intent of the parties, including [Brimlow]'s to the end was to live together as a mostly committed and exclusive relationship.

As a result, the court concluded that the evidence supported the existence of a

9

CIR. On July 19, 2022, the trial court entered "Preliminary Findings and Conclusions about a Committed Intimate Relationship" and the Addendum.

Before dividing assets, the court asked the parties for proposed final orders distributing all community-like property consistent with its ruling. Harris submitted an asset spreadsheet valuing the two houses and his and Brimlow's retirement accounts. He valued the Green Lake house at $825,000 with a mortgage of $313,534 for a net value of $511,466. He valued the Burien house at $565,000 with a mortgage of $149,768 for a net value of $415,232. And he valued his retirement assets at $49,389 and Brimlow's at $492,838. Harris requested that the trial court award him the Green Lake house and Brimlow the Burien house. He asked the court to divide the parties' retirement funds equally or, in the alternative, order Brimlow to pay him a $173,608 judgment to equalize their assets.

Brimlow did not request a division of community-like property. Nor did he assign values to the houses. Instead, he argued that he was entitled to both homes because the evidence at trial showed that they were his separate property. Brimlow also asserted that some of the retirement assets are separate property and "will need to be traced by an expert in order to determine the separate vs. community-like portions in order for the court to divide them properly."

On August 25, 2022, the court entered final findings and conclusions and an order dividing property. It found that the parties were in a CIR no later than September 2003 and that both Harris and Brimlow were on the titles of the Green

Lake and Burien houses. Accordingly, it characterized those assets as community-like property. It awarded Harris the Green Lake house and Brimlow the Burien house. The court identified the retirement assets as possible community-like property but declined to distribute them or to order a judgment equalizing assets.

Brimlow moved for reconsideration, which the trial court denied. Brimlow appeals.

ANALYSIS

Brimlow challenges several of the trial court's findings of fact and argues they do not support the court's conclusion that he and Harris were in a CIR. He also asserts that the trial court's distribution of property is unfair.

1. Findings of Fact

Whether a CIR exits is a mixed question of law and fact. *In re Marriage of Pennington*, 142 Wn.2d 592, 602-03, 14 P.3d 764 (2000). We review a trial court's findings of fact for substantial evidence. *In re Parentage of G.W.-F.*, 170 Wn. App. 631, 637, 285 P.3d 208 (2012). Substantial evidence is that which is sufficient to persuade a fair-minded, rational person of the finding's truth. *Id.* If substantial evidence supports the finding, it does not matter that other evidence may contradict it. *In re Marriage of Burrill*, 113 Wn. App. 863, 868, 56 P.3d 993 (2002). We will not substitute our own judgment for that of the fact finder, so we defer to the trier of fact to resolve conflicting testimony, evaluate the persuasiveness of the evidence, and assess witness credibility. *G.W.-F.*, 170

Wn. App. at 637.  Unchallenged findings of fact are verities on appeal.  *Muridan*

*v. Redl*, 3 Wn. App. 2d 44, 62-63, 413 P.3d 1072 (2018).

Brimlow challenges findings of fact 1, 2, 3, 4, 5, 6, and 7 in the Addendum.

But he does not argue those facts are unsupported by substantial evidence.

Instead, he argues that the trial court "dismissed the entirety of [his] case by

summarily ignoring his testimony and that of the other witnesses who testified on

his behalf."  According to Brimlow, the trial court "fell victim" to relying on an

outdated pattern jury instruction in assessing credibility.  We disagree.

In assessing the credibility of witnesses and conflicting testimony, the trial

court explained that it considers:

> [T]he opportunity of the witness to observe or know the things they
> testify about; the ability of the witness to observe accurately; the
> quality of a witness's memory while testifying; **the manner of the
> witness while testifying**; any personal interest that the witness
> might have in the outcome or the issues; any bias or prejudice that
> the witness may have shown; **the reasonableness of the
> witness's statements in the context of all of the other
> evidence**; and any other factors that affect the Court's evaluation
> or belief of a witness or its evaluation of his or her testimony.

This language mimics the language of 6 *Washington Pattern Jury Instructions:*

*Civil* 1.02, at 27 (7th ed. 2022) (WPI).[3]  And because Brimlow cites no authority

to support his claim that the court erred by using this language as a guide to

assess witness credibility, we are not persuaded by his argument.  *See In re*

*Marriage of Raskob*, 183 Wn. App. 503, 517 n.25, 334 P.3d 30 (2014) (if a party

cites no authority in support of a proposition, we may assume that counsel, after

---

[3] Brimlow erroneously identifies the source of the language as WPI 2.07, at 52.
He points out that the comment to WPI 2.07 recommends against giving the instruction.
While that is true, the comment to WPI 2.07 also clarifies that the portion of WPI 1.02
"related to witnesses" and their credibility makes giving WPI 2.07 "unnecessary."

diligent search, found none).  Indeed, the note on use for WPI 1.02, at 29, instructs courts to "[g]ive this instruction in every case."

In any event, the trial court explained how it made its credibility determinations.  It found Harris' testimony more credible than Brimlow's because Harris "testified in a straightforward, calm, and forthright manner," and his "claims about his relationship with [Brimlow] were reasonable in the context of the other evidence."  In contrast, it found that Brimlow's account of the nature of his relationship with Harris failed to explain how they lived "peacefully for so long when they had such different understandings of the relationship."  And the court found Harris' witnesses more credible than Brimlow's because Harris' witnesses "observed [the couple] interact directly and regularly," while Brimlow's witnesses had "very limited interaction with them *as a couple*," they had "obvious financial interests" in "testifying favorably" for Brimlow, or their knowledge of the relationship came from only Brimlow.

 The record shows that the trial court carefully weighed the competing testimony using appropriate factors.  And substantial evidence supports the court's findings.  We reject Brimlow's challenge to the trial court's findings of fact.

2.  Conclusions of Law

Brimlow argues that the trial court erred by concluding that its findings of fact support the elements of a CIR.  We disagree.

We review the trial court's conclusion that the parties were in a CIR de novo.  *Muridan*, 3 Wn. App. 2d at 54.  Although we defer to the trial court's

findings of fact, we review de novo whether the trial court's legal conclusions properly follow from those findings. *Id.*

A CIR is a stable, marital-like relationship where both parties cohabit with knowledge that a lawful marriage between them does not exist. *Connell v. Francisco*, 127 Wn.2d 339, 346, 898 P.2d 831 (1995).[4] The CIR doctrine stems from equitable principles and protects the interests of unmarried parties who acquire property during their relationship by preventing the unjust enrichment of one at the expense of the other when the relationship ends. *Id.* at 349; *Pennington*, 142 Wn.2d at 602.

In determining whether a CIR exists, courts consider several factors, including (1) continuous cohabitation, (2) duration of the relationship, (3) purpose of the relationship, (4) pooling of resources and services for joint projects, and (5) the intent of the parties. *Connell*, 127 Wn.2d at 346. These factors are not exclusive, and no one factor is more important than another. *Id.*; *Pennington*, 142 Wn.2d at 605. And we do not apply them in a hypertechnical fashion. *Muridan*, 3 Wn. App. 2d at 55. Instead, we "base the determination on the circumstances of each case." *Id.*

Brimlow challenges the trial court's conclusions that he and Harris (A) continuously cohabitated, (B) pooled resources, and (C) intended to form a CIR. We address each argument in turn.

---

[4] We note that *Connell* uses the term "meretricious relationship" instead of CIR. We no longer use that term. *See In re Meretricious Relationship of Long*, 158 Wn. App. 919, 244 P.3d 26 (2010).

A. Continuous Cohabitation

The trial court concluded that Harris and Brimlow "continually cohabitated for nearly 16 years." It found that they "began to cohabitate no later than September 2003, when [Harris] would stay nearly nightly at [Brimlow]'s old Burien house." And they stopped cohabitating around March 19, 2021, when Harris moved out of their Green Lake house. Substantial evidence supports the court's findings. Still, citing *Pennington*, Brimlow argues that continuous cohabitation usually requires the parties to consistently live with each other without other partners. And because Brimlow "had [many] other partners" during the time he lived with Harris, their "living arrangement . . . [did] not rise to the level of cohabitation."

In *Pennington*, our Supreme Court considered whether an on-again, off-again relationship amounted to continuous cohabitation. 142 Wn.2d at 603. The parties in that case lived together for six years, during most of which one party was married to another; broke up and briefly lived apart; reunited and lived together for two years; broke up again and lived apart for over a year, during which both parties dated other people and one party lived with another partner; then reunited again and lived together for less than a year before their final breakup. *Id.* at 595-97. The court determined those facts established the parties' "cohabitation was sporadic and not continuous enough to evidence a stable cohabiting relationship." *Id.* at 603.

This case is different. The record shows Brimlow and Harris continually lived together between September 2003 and March 2021. Harris was unaware

that Brimlow had other partners during that time. Indeed, Brimlow testified that he "didn't share that part of [his] life" with Harris. Further, Harris said that if Brimlow had disclosed other partners, he would have ended their relationship. Accordingly, when Harris discovered Brimlow's infidelity, he moved out. These facts suggest a "stable cohabiting relationship." *Pennington*, 142 Wn.2d at 603.

The trial court did not err by concluding that this factor supports a determination that Harris and Brimlow were in a CIR.

### B. Pooling of Resources and Services for Joint Projects

The court concluded that "the parties pooled their resources and services for the many joint projects they engaged in." The court found that the parties shared a bank account and insurance accounts "that exceeded any interest in simply the Green Lake property." It also found that the parties shared automobile insurance. And "[e]ach party at some point during their relationship carried each other on their employer's health insurance policies, where each was identified as the other's " 'domestic partner.' " The court also found that Brimlow "accepted the responsibility and benefits of being [Harris'] power of attorney and beneficiary on legal or financial instruments," such as his brokerage account and will.

Brimlow argues that their "pooled resources for purposes of investment in real estate as a joint venture" does not show that they did so for the purposes of a CIR but, rather, as only business partners. We rejected a similar argument in *In re Meretricious Relationship of Long*, 158 Wn. App. 919, 244 P.3d 26 (2010). In that case, the trial court correctly found that purchasing two houses together, sharing the mortgage and other household expenses, and jointly working on

each other's rental properties satisfied the pooling of resources factor. *Id.* at 927-28. As in *Long*, substantial evidence supports the court's findings that Harris and Brimlow pooled resources beyond that expected of business partners.

The trial court did not err by concluding that Harris and Brimlow pooled resources consistent with a CIR.

C. Intent of the Parties

The trial court concluded that "the intent of the parties, including [Brimlow]'s to the end was to live together as a mostly committed and exclusive relationship." It found that "while [Harris and Brimlow] did not have a regular sexual relationship, they 'loved one another as deeply' as any other committed relationship and that [Brimlow] was a 'very loving person to [Harris],' as [Harris] was to [Brimlow]." Brimlow argues that the findings do not support this conclusion because he and Harris "were in an asexual relationship," he "had relations with many other people," and they "slept in different rooms on different floors" of the Green Lake house. We disagree.

The word "intimate" in the term "CIR" is "not intended to make *sexual* intimacy the litmus test" in determining the existence of a marital-like relationship. *Muridan*, 3 Wn. App. 2d at 61. And "[s]ex is not a threshold requirement for intimacy." *Id.* While courts may consider physical intimacy in determining whether the parties intended to form a CIR, it is not required. *Id.* Similarly, while evidence of infidelity weighs against a court's determination that the unfaithful party intended to form a CIR, it is not determinative. *Id.* at 60.

17

Here, substantial evidence supported the court's findings.[5]  The evidence showed Harris and Brimlow lived together continuously for 16 years.  They bought two houses together and had at least one joint checking account.  They shared homeowner's and auto insurance policies and each added the other as domestic partners to their employer's medical and dental insurance.  They travelled and socialized extensively together.  And they sent joint Christmas cards to their neighbor and exchanged Valentine's day cards for several years.  The trial court's findings support its conclusion that Harris and Brimlow intended to form a CIR.

In sum, we affirm the trial court's conclusion that the parties were in a CIR.

3. Division of Property

Brimlow argues that the trial court erred in its distribution of property.  Again, we disagree.

If a court determines that a CIR exists, it then (1) evaluates the interest each party has in the property acquired during the relationship and (2) makes a just and equitable distribution of the property.  *Connell*, 127 Wn.2d at 349.  Courts presume that property acquired during a CIR is community-like.  *Pennington*, 142 Wn.2d at 602.  But a party may rebut this presumption if the distribution of property would unjustly enrich one party at the expense of the other at the end of the relationship.  *Id.*  We review a trial court's distribution of property from a CIR for an abuse of discretion.  *Muridan*, 3 Wn. App. 2d at 56.  A

---

[5] While Brimlow may have offered competing evidence, so long as substantial evidence supports the court's finding, it does not matter to this court's reviewing function that other evidence may contradict it.  *Burrill*, 113 Wn. App. at 868.

trial court abuses its discretion if it bases its decision on untenable grounds or untenable reasons. *Byerley v. Cail*, 183 Wn. App. 677, 685, 334 P.3d 108 (2014).

Here, the trial court identified the Green Lake house and the Burien house as community-like real property. And it identified Harris and Brimlow's retirement accounts as potentially community-like personal property. Evidence adduced at trial and in post-trial submissions valued the Green Lake house at $825,000 with a mortgage of $313,534, leaving a net value of $511,466. And the Burien house was $565,000 with a mortgage of $149,768 for a net value of $415,232.[6] Post-trial submissions valued Harris' retirement assets at $49,389 and Brimlow's at $492,838. The court awarded the Green Lake house to Harris and the Burien house to Brimlow. While the award of the properties favored Harris, the court also chose not to divide the retirement accounts, which favored Brimlow.

Brimlow argues the division was not fair because the court disregarded the JVA in which the parties agreed to share a proportionate interest in the properties based on their respective financial investments. But the trial court determined that the parties terminated the JVA. And it found credible Harris' testimony that the parties intended to use the JVA only to secure financing, not to

---

[6] On appeal, Brimlow appears to dispute the value of the houses and asks us to take judicial notice of the most recent assessed values of the properties taken from the King County Assessor's website. But Brimlow had several opportunities to offer evidence of the houses' values below and chose not to do so. And we review the trial court's division of property for an abuse of discretion, which requires us to look at the evidence before the court when it made its decision. *Muridan*, 3 Wn. App. 2d at 56. As a result, we decline to take judicial notice of the current assessed values.

define their future financial relationship. Brimlow fails to show that the trial court abused its discretion in its division of property.

We affirm the trial court's conclusion that Harris and Brimlow were in a CIR and its division of property.

Brennan, J.

WE CONCUR:

Birk, J.                    Coburn, J.